# USERY, SECRETARY OF LABOR, ET AL. *v.* TURNER ELKHORN MINING CO. ET AL.

No. 74-1302. Argued December 2, 1975—Decided July 1, 1976*

---

*Together with No. 74-1316, *Turner Elkhorn Mining Co. et al.* v. *Usery, Secretary of Labor, et al.,* also on appeal from the same court.

1

4

*Deputy Solicitor General Wallace* argued the cause for appellants in No. 74–1302 and for appellees in No. 74–1316. With him on the brief were *Solicitor General Bork, Assistant Attorney General Lee, Ronald R. Glancz,* and *Laurie Streeter.*

*R. R. McMahan* argued the cause for appellees in No. 74–1302 and for appellants in No. 74–1316. With him on the briefs was *James M. Graves.*†

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Twenty-two coal mine operators (Operators) brought this suit to test the constitutionality of certain aspects of Title IV of the Federal Coal Mine Health and Safety Act of 1969, 83 Stat. 792, as amended by the Black Lung Benefits Act of 1972, 86 Stat. 150, 30 U. S. C. § 901 *et seq.* (1970 ed. and Supp. IV). The Operators, potentially liable under the amended Act to compensate certain miners, former miners, and their survivors for death or total disability due to pneumoconiosis arising out of employment in coal mines, sought declaratory and injunctive relief against the Secretary of Labor and the

---

†*Joseph A. Yablonski* and *Willard P. Owens* filed a brief for the United Mine Workers of America as *amicus curiae* urging reversal in No. 74–1302 and affirmance in No. 74–1316.

*Guy Farmer* and *William A. Gershuny* filed a brief for the Bituminous Coal Operators' Assn., Inc., as *amicus curiae.*

Secretary of Health, Education, and Welfare, who are responsible for the administration of the Act and the promulgation of regulations under the Act.

On cross-motions for summary judgment, a three-judge District Court for the Eastern District of Kentucky, convened pursuant to 28 U. S. C. §§ 2282 and 2284, found the amended Act constitutional on its face, except in regard to two provisions concerning the determination of a miner's total disability due to pneumoconiosis. The court enjoined the Secretary of Labor from further application of those two provisions. 385 F. Supp. 424 (1974). After granting a stay of the three-judge court's order, 421 U. S. 944 (1975), we noted probable jurisdiction of the cross-appeals. 421 U. S. 1010 (1975). We conclude that the amended Act, as interpreted, is constitutionally sound against the Operators' challenges.

I

Coal workers' pneumoconiosis—black lung disease—affects a high percentage of American coal miners with severe, and frequently crippling, chronic respiratory impairment.[1] The disease is caused by long-term inhalation of coal dust.[2] Coal workers' pneumoconiosis (here-

---

[1] The House and Senate Reports on the 1969 Act placed the number of afflicted active and retired miners at 100,000. S. Rep. No. 91–411, p. 6 (1969), and H. R. Rep. No. 91–563, p. 17 (1969). The Senate Report, *supra*, at 7, specified that, on the basis of X-ray examination, the disease rate was 10% for then-active coal miners, and 20% for inactive coal miners. Other estimates have run significantly higher. See, *e. g.*, Hearings on S. 355, before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 91st Cong., 1st Sess., pt. 2, p. 641 (1969).

[2] Coal workers' pneumoconiosis is a distinct clinical entity, and is not the only type of pneumoconiosis. The remarks of the Surgeon General, reproduced in H. R. Rep. No. 91–563, *supra*, at 15, indi-

after pneumoconiosis) is generally diagnosed on the basis of X-ray opacities indicating nodular lesions on the lungs of a patient with a long history of coal dust exposure. As the Surgeon General has stated, however, post-mortem examination data have indicated a greater prevalence of the disease than X-ray diagnosis reveals.

According to the Surgeon General, pneumoconiosis is customarily classified as "simple" or "complicated."[3] Simple pneumoconiosis, ordinarily identified by X-ray opacities of a limited extent, is generally regarded by physicians as seldom productive of significant respiratory impairment. Complicated pneumoconiosis, generally far more serious, involves progressive massive fibrosis as a complex reaction to dust and other factors (which may include tuberculosis or other infection), and usually[4] produces significant pulmonary impairment and marked respiratory disability. This disability limits the victim's physical capabilities, may induce death by cardiac failure, and may contribute to other causes of death.[5]

Removing the miner from the source of coal dust has so far proved the only effective means of preventing the contraction of pneumoconiosis, and once contracted the disease is irreversible in both its simple and complicated stages. No therapy has been developed. Finally, because the disease is progressive,[6] at least in its com-

---

cate that the pathological condition of pneumoconiosis may also be caused by inhalation of other dusty materials, such as cotton fibers or silica.

[3] S. Rep. No. 91–411, *supra,* at 7–8; H. R. Rep. No. 91–563, *supra,* at 15–16.

[4] There was evidence before Congress that the complicated stage of the disease is sometimes exhibited with "mild pulmonary function changes and little or no disability." Hearings on S. 355, *supra,* n. 1, at 858.

[5] *Ibid.*

[6] *Ibid.*

8

plicated stage, its symptoms may become apparent only after a miner has left the coal mines.

In order to curb the incidence of pneumoconiosis, Congress provided in Title II of the Federal Coal Mine Health and Safety Act of 1969, § 201 *et seq.*, 30 U. S. C. § 841 *et seq.*, for limits on the amount of dust to be permitted in the ambient air of coal mines. Additionally, in view of the then-established prevalence of irreversible pneumoconiosis among miners, and the insufficiency of state compensation programs, Congress passed Title IV of the 1969 Act, § 401 *et seq.*, 30 U. S. C. § 901 *et seq.*, to provide benefits to afflicted miners and their survivors. These benefit provisions were subsequently broadened by the Black Lung Benefits Act of 1972. 30 U. S. C. § 901 *et seq.* (1970 ed., Supp. IV).

As amended, the Act divides the financial responsibility for payment of benefits into three parts. Under Part B of Title IV, §§ 411–414, 30 U. S. C. §§ 921–924 (1970 ed. and Supp. IV), claims filed between December 30, 1969, the date of enactment, and June 30, 1973, are adjudicated by the Secretary of Health, Education, and Welfare and paid by the United States.[7]

Under Part C of Title IV, §§ 421–431, 30 U. S. C. §§ 931–941 (1970 ed. and Supp. IV), claims filed after December 31, 1973, are to be processed under an applicable state workmen's compensation law approved by the Secretary of Labor under the standards set forth in § 421, 30 U. S. C. § 931 (1970 ed. and Supp. IV). In

[7] As of December 31, 1974, 556,200 claims had been filed under Part B of the law. As of that date, with all but 400 cases decided, 509,900 individuals had established eligibility as black lung beneficiaries under the Act. Department of Health, Education, and Welfare, Fifth Annual Report to Congress on the Administration of Part B of Title IV of the Federal Coal Mine Health and Safety Act of 1969, p. 3 (1975).

the absence of such an approved state program, and to date no state program has been approved, claims are to be filed with and adjudicated by the Secretary of Labor, and paid by the mine operators. § 422, 30 U. S. C. § 932 (1970 ed. and Supp. IV). Under § 422 an operator who is entitled to a hearing in connection with these claims is liable for Part C benefits with respect to death or total disability due to pneumoconiosis arising out of employment in a mine for which the operator is responsible. The operator's liability for Part C benefits covers the period from January 1, 1974, to December 30, 1981. Payments of benefits under Part C are to the same categories of persons—a miner or certain survivors—and in the same amounts, as under Part B. §§ 422 (c), (d); see § 412 (a), 30 U. S. C. § 922 (a) (1970 ed. and Supp. IV).[8]

Claims filed during the transition period between the Federal Government benefit provision under Part B, and state plan or operator benefit provision under Part C— that is, July 1 to December 31, 1973—are adjudicated

---

[8] The individual claimant is entitled to benefits at a rate equal to 50% of the minimum monthly payment to which a totally disabled federal employee in Grade GS–2 is entitled. § 412(a)(1), 30 U. S. C. § 922 (a)(1). At current rates, the individual claimant's entitlement is $196.80 per month, or $2,361.60 per year. 40 Fed. Reg. 56886–56887 (1975); see 20 CFR § 410.510 (1975). These basic benefits are increased if the claimant has dependents; the maximum increase of 100% is available if the claimant has three or more dependents. § 412 (a)(4), 30 U. S. C. § 922 (a)(4) (1970 ed., Supp. IV). See also 30 U. S. C. §§ 922 (a)(3), (5) (1970 ed., Supp. IV). Thus, the maximum in benefits to which a claimant could be entitled is $393.60 per month, or $4,723.20 per year. Benefits under Part C are reduced to account for certain alternative income. § 422 (g), 30 U. S. C. § 932 (g). In addition to these monthly benefits, the operators are responsible for claimants' medical expenses. See § 422 (a), 30 U. S. C. § 932 (a) (1970 ed., Supp. IV), incorporating 33 U. S. C. § 907 (1970 ed., Supp. IV).

under § 415 of Part B, 30 U. S. C. § 925 (1970 ed., Supp. IV), by the Secretary of Labor. The United States is responsible for payment of these claims until December 31, 1973. Responsible operators, having been notified of a claim and entitled to participate in a hearing thereon, are thereafter liable for benefits as if the claim had been filed pursuant to Part C and § 422 had been applicable to the operator.

The Act provides that a miner shall be considered "totally disabled," and consequently entitled to compensation, "when pneumoconiosis prevents him from engaging in gainful employment requiring the skills and abilities comparable to those of any employment in a mine or mines in which he previously engaged with some regularity and over a substantial period of time." § 402 (f), 30 U. S. C. § 902 (f) (1970 ed., Supp. IV).[9] The Act also prescribes several "presumptions" for use in determining compensable disability.[10] Under § 411(c)(3), a miner

---

[9] Section 402 (f), as set forth in 30 U. S. C. § 902 (f) (1970 ed., Supp. IV), provides in full:

"The term 'total disability' has the meaning given it by regulations of the Secretary of Health, Education, and Welfare, except that such regulations shall provide that a miner shall be considered totally disabled when pneumoconiosis prevents him from engaging in gainful employment requiring the skills and abilities comparable to those of any employment in a mine or mines in which he previously engaged with some regularity and over a substantial period of time. Such regulations shall not provide more restrictive criteria than those applicable under section 423 (d) of Title 42."

The Act defines "pneumoconiosis" as "a chronic dust disease of the lung arising out of employment in a coal mine." § 402 (b), 30 U. S. C. § 902 (b) (1970 ed., Supp. IV).

[10] These presumptions are applicable directly to Part B adjudications by the Secretary of HEW, and indirectly to transition-period and Part C adjudications by the Secretary of Labor by operation of §§ 422 (h) and 411 (b), 30 U. S. C. §§ 932 (h) and 921 (b) (1970 ed. and Supp. IV). See S. Rep. No. 92–743, p. 21 (1972). See also

shown by X-ray or other clinical evidence to be afflicted with complicated pneumoconiosis is "irrebuttably presumed" to be totally disabled due to pneumoconiosis; if he has died, it is irrebuttably presumed that he was totally disabled by pneumoconiosis at the time of his death, and that his death was due to pneumoconiosis. 30 U. S. C. § 921 (c)(3) (1970 ed., Supp. IV). In any event, the presumption operates conclusively to establish entitlement to benefits.

The other presumptions are each explicitly rebuttable by an operator seeking to avoid liability. There are three such presumptions. First, if a miner with 10 or more years' employment in the mines contracts pneumoconiosis, it is rebuttably presumed that the disease arose out of such employment. § 411 (c)(1), 30 U. S. C. § 921 (c)(1) (1970 ed., Supp. IV). Second, if a miner with 10 or more years' employment in the mines died from a "respirable disease," it is rebuttably presumed that his death was due to pneumoconiosis. § 411 (c)(2), 30 U. S. C. § 921 (c)(2) (1970 ed., Supp. IV). Finally, if a miner, or the survivor of a miner, with 15 or more years' employment in underground coal mines is able, despite the absence of clinical evidence of complicated pneumoconiosis, to demonstrate a totally disabling respiratory or pulmonary impairment, the Act rebuttably presumes that the total disability is due to pneumoconiosis, that the miner was totally disabled by pneumoconiosis when he died, and that the miner's death was due to pneumoconiosis. § 411 (c)(4), 30 U. S. C. § 921 (c)(4) (1970 ed., Supp. IV).[11] Section 411 (c)(4) specifically provides: "The Secre-

_____

§§ 422 (f)(2), 430, 30 U. S. C. §§ 932 (f)(2), 940 (1970 ed., Supp. IV).

[11] The use of this presumption in Part C adjudications is limited in some regards not significant in this case. See §§ 422 (f)(2), 430, 30 U. S. C. §§ 932 (f)(2), 940 (1970 ed., Supp. IV).

tary may rebut [this latter] presumption only by establishing that (A) such miner does not, or did not, have pneumoconiosis, or that (B) his respiratory or pulmonary impairment did not arise out of, or in connection with, employment in a coal mine." Moreover, under § 413 (b), 30 U. S. C. § 923 (b) (1970 ed., Supp. IV), none of these three rebuttable presumptions may be defeated solely on the basis of a chest X-ray.[12]

## II

In initiating this suit against the defendant Secretaries (hereafter Federal Parties), the Operators contended that the amended Act is unconstitutional insofar as it requires the payment of benefits with respect to miners who left employment in the industry before the effective date of the Act; that the Act's definitions, presumptions, and limitations on rebuttal evidence unconstitutionally impair the operators' ability to defend against benefit claims; and that certain regulations promulgated by the Secretary of Labor regarding the apportionment of liability for benefits among operators, and the provision of medical benefits, are inconsistent with the Act and constitutionally defective.

---

[12] Section 413 (b), as set forth in 30 U. S. C. § 923 (b) (1970 ed., Supp. IV), provides in pertinent part: "[N]o claim for benefits *under this part* shall be denied solely on the basis of the results of a chest roentgenogram." (Emphasis added.)  Section 413 (b) is found in Part B of Title IV.  Section 430, as set forth in 30 U. S. C. § 940 (1970 ed., Supp. IV), provides, however, that "[t]he amendments made by the Black Lung Benefits Act of 1972 to part B . . . shall, to the extent appropriate, also apply [with limitations not relevant here] to . . . part [C]."  The legislative history, moreover, makes clear that the § 413 (b) limitation on use of X-ray evidence, enacted as § 4 (f) of the 1972 Act, was intended to apply to Part C claims as well as Part B claims, see H. R. Conf. Rep. No. 92–1048, p. 9 (1972), and the Operators so concede.  Brief for Operators 21.

The three-judge District Court held that all issues as to the validity of the challenged regulations were within the jurisdiction of a single district judge, and the court entered an order so remanding them. 385 F. Supp., at 426. The District Court upheld each challenged statutory provision as constitutional, with two exceptions. First, the District Court held that § 411 (c)(3)'s irrebuttable presumption is unconstitutional as an unreasonable and arbitrary legislative finding of total disability "in terms other than those provided by the Act as standards for total disability." 385 F. Supp., at 430. Second, reading the limitation on evidence in rebuttal to § 411 (c) (4)'s presumption of total disability due to pneumoconiosis to apply to an operator's defense in a § 415 transition-period case, the District Court found that limitation unconstitutional in two respects. It held the limitation arbitrary and unreasonable in not permitting a rebuttal showing that the case of pneumoconiosis afflicting the miner was not disabling. 385 F. Supp., at 430. And taking the provision to mean that an operator may defend against liability only on the ground that the pneumoconiosis did not arise out of employment in *any* coal mine, rather than on the ground that it did not arise out of employment in a coal mine for which the operator was responsible, the District Court found the provision an unreasonable and arbitrary limitation on rebuttal evidence relevant and proper under § 422 (c), 30 U. S. C. § 932 (c). 385 F. Supp., at 430–431. The District Court accordingly entered an order declaring unconstitutional, and enjoining the Secretary of Labor from seeking to apply, § 411 (c)(3)'s irrebuttable presumption and § 411 (c)(4)'s limitation on rebuttable evidence.

The Operators' appeal, No. 74–1316, reasserts the constitutional challenges rejected by the District Court.

The appeal of the Federal Parties, No. 74–1302, seeks reversal of the declaration and injunction respecting the constitutionality of §§ 411 (c)(3) and (4). Neither side here questions the District Court's decision not to address the issues raised with respect to the Secretary of Labor's regulations. As we have already noted, we uphold the statute against all the constitutional contentions properly presented here. Because we read the limitation on rebuttal evidence in § 411 (c)(4) as inapplicable to the Operators, however, we vacate that portion of the District Court's order which invalidates that limitation.

### III

The Federal Parties direct our attention initially to *National Independent Coal Operators Assn.* v. *Brennan,* 372 F. Supp. 16 (DC), summarily aff'd, 419 U. S. 955 (1974), which raised a number of issues identical to those presented here. Our summary affirmance in that case did not foreclose the District Court's determination of unconstitutionality regarding §§ 411 (c)(3) and (4), those issues not having been before us on the appeal. Several questions presented here—most notably those of retroactivity and preclusion of sole reliance on X-ray testimony evidence—were raised and decided in *National Independent Coal Operators Assn.* v. *Brennan,* but having heard oral argument and entertained full briefing on these issues together with the other questions raised in the case, we proceed to treat them here more fully. Cf. *Edelman* v. *Jordan,* 415 U. S. 651, 670–671 (1974).

### IV

The Operators contend that the amended Act violates the Fifth Amendment Due Process Clause by requiring them to compensate former employees who terminated their work in the industry before the Act was passed,

and the survivors of such employees.[13]  The Operators accept the liability imposed upon them to compensate employees working in coal mines now and in the future who are disabled by pneumoconiosis; and they recognize Congress' power to create a program for compensation of disabled inactive coal miners.  But the Operators complain that to impose liability upon them for former employees' disabilities is impermissibly to charge them with an unexpected liability for past, completed acts that were legally proper and, at least in part, unknown to be dangerous at the time.

It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.  See, e. g., *Ferguson* v. *Skrupa*, 372 U. S. 726 (1963); *Williamson* v. *Lee Optical Co.*, 348 U. S. 483, 487–488 (1955).  And this Court long ago upheld against due process attack the competence of Congress to allocate the interlocking economic rights and duties of employers and employees upon workmen's compensation principles analogous to those enacted here, regardless of contravening arrangements between employer and employee.  *New York Central R. Co.* v. *White*, 243 U. S. 188 (1917); see also *Philadelphia, B. & W. R. Co.* v. *Schubert*, 224 U. S. 603 (1912).

To be sure, insofar as the Act requires compensation for disabilities bred during employment terminated

---

[13] For simplicity of discussion, we will generally refer to claims as though presented by the miner himself, although they may in fact be maintained upon death by a survivor.  Neither the District Court nor the parties have distinguished miners' claims from survivors' claims under the constitutional attacks raised in this case.

before the date of enactment, the Act has some retrospective effect—although, as we have noted, the Act imposed no liability on operators until 1974.[14]   And it may be that the liability imposed by the Act for disabilities suffered by former employees was not anticipated at the time of actual employment.[15]   But our cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations.   See *Fleming* v. *Rhodes,* 331 U. S. 100 (1947); *Carpenter* v. *Wabash R. Co.,* 309 U. S. 23 (1940); *Norman* v. *Baltimore & Ohio R. Co.,* 294 U. S. 240 (1935); *Home Bldg. & Loan Assn.* v. *Blaisdell,* 290 U. S. 398 (1934); *Louisville & Nashville R. Co.* v. *Mottley,* 219 U. S. 467 (1911).   This is true even though the effect of the legislation is to impose a new duty or liability based on past acts.   See *Lichter* v. *United States,* 334 U. S. 742 (1948); *Welch* v. *Henry,* 305 U. S. 134 (1938); *Funkhouser* v. *Preston Co.,* 290 U. S. 163 (1933).

It does not follow, however, that what Congress can legislate prospectively it can legislate retrospectively.

---

[14] The Federal Parties suggest that since a claim for benefits under Part C must be filed within three years of the discovery of total disability due to pneumoconiosis (or the date of death), § 422 (f)(1), 30 U. S. C. § 932 (f)(1) (1970 ed., Supp. IV), the operators will not ordinarily be liable for any disabilities maturing before enactment of their responsibility.   See also § 422 (f)(2), 30 U. S. C. § 932 (f)(2) (1970 ed., Supp. IV).   This does not hold true, however, for nonunderground operators, since Part C liability did not apply to them until 1972.   See Black Lung Benefits Act of 1972, § 3, 86 Stat. 153, amending §§ 401, 402 (b), (d), 411 (c)(1), (2), 422 (a), (h), 423 (a), 30 U. S. C. §§ 901, 902 (b), (d), 921 (c)(1), (2), 932 (a), (h), 933 (a) (1970 ed., Supp. IV).   In any event, we think the point unnecessary to our conclusion.

[15] The Operators have not contended, however, that the Act is constitutionally defective insofar as it requires them to provide compensation for *present* employees whose disabilities may stem from exposure that was terminated before enactment of the Act.

The retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former. Thus, in this case the justification for the retrospective imposition of liability must take into account the possibilities that the Operators may not have known of the danger of their employees' contracting pneumoconiosis, and that even if they did know of the danger their conduct may have been taken in reliance upon the current state of the law, which imposed no liability on them for disabling pneumoconiosis.[16] While the Operators have clearly been aware of the danger of pneumoconiosis for at least 20 years,[17] and while they have not specifically pressed the contention that they would have taken steps to reduce or eliminate the incidence of pneumoconiosis had the law imposed liability upon them, we would nevertheless hesitate to approve the retrospective imposition of liability on any theory of deterrence, cf. *United States* v. *Peltier*, 422 U. S. 531, 542

---

[16] Whether or not a person who could have anticipated the potential liability attaching to his chosen course of conduct would have avoided the liability by altering his conduct has been significant in at least one line of cases in this Court. In *Welch* v. *Henry*, 305 U. S. 134 (1938), the Court upheld against a due process attack a state statute enacted in 1935 taxing 1933 dividend income that the 1933 taxing statute had explicitly exempted. Adopting the view that a stockholder would have continued to receive corporate dividends even if he knew that the dividends would subsequently be taxed, the Court distinguished prior cases invalidating the retroactive taxation of gifts on the ground that the donor might have refrained from making the gift had he anticipated the tax. *Id.*, at 147–148. But see *Carpenter* v. *Wabash R. Co.*, 309 U. S. 23 (1940); *Louisville & Nashville R. Co.* v. *Mottley*, 219 U. S. 467 (1911).

[17] Coal miner's pneumoconiosis was recognized in Great Britain as early as 1943. It was not generally recognized in the United States as an entity distinct from silicosis until the 1950's. S. Rep. No. 91–411, p. 8 (1969).

(1975), or blameworthiness, cf. *ibid.; De Veau* v. *Braisted,* 363 U. S. 144, 160 (1960).

We find, however, that the imposition of liability for the effects of disabilities bred in the past is justified as a rational measure to spread the costs of the employees' disabilities to those who have profited from the fruits of their labor—the operators and the coal consumers. The Operators do not challenge Congress' power to impose the burden of past mine working conditions on the industry. They do claim, however, that the Act spreads costs in an arbitrary and irrational manner by basing liability upon past employment relationships, rather than taxing all coal mine operators presently in business. The Operators note that a coal mine operator whose work force has declined may be faced with a total liability that is disproportionate to the number of miners currently employed. And they argue that the liability scheme gives an unfair competitive advantage to new entrants into the industry, who are not saddled with the burden of compensation for inactive miners' disabilities. In essence the Operators contend that competitive forces will prevent them from effectively passing on to the consumer the costs of compensation for inactive miners' disabilities, and will unfairly leave the burden on the early operators alone.

Of course, as we have already indicated, a substantial portion of the burden for disabilities stemming from the period prior to enactment is borne by the Federal Government. But even taking the Operators' argument at face value, it is for Congress to choose between imposing the burden of inactive miners' disabilities on all operators, including new entrants and farsighted early operators who might have taken steps to minimize black lung dangers, or to impose that liability solely on those early operators whose profits may have been increased at the expense of their employees' health. We are unwilling to assess the

wisdom of Congress' chosen scheme by examining the degree to which the "cost-savings" enjoyed by operators in the pre-enactment period produced "excess" profits, or the degree to which the retrospective liability imposed on the early operators can now be passed on to the consumer. It is enough to say that the Act approaches the problem of cost spreading rationally; whether a broader cost-spreading scheme would have been wiser or more practical under the circumstances is not a question of constitutional dimension. See, *e. g., Ferguson* v. *Skrupa,* 372 U. S., at 730–732; *Williamson* v. *Lee Optical Co.,* 348 U. S., at 488.

The Operators ultimately rest their due process argument on *Railroad Retirement Board* v. *Alton R. Co.,* 295 U. S. 330 (1935), in which the Court found the Railroad Retirement Act of 1934 to be unconstitutional. Among the provisions specifically invalidated as arbitrary was a provision for employer-financed pensions for former employees who, though not in the employ of the railroads at the time of enactment, had been so employed within the year. Assuming that the portion of *Alton* invalidating this provision retains vitality,[18] we find it distinguishable from this case. The point of the black lung benefit provisions is not simply to increase or supplement a former employee's salary to meet his generalized need for funds. Rather, the purpose of the Act is to satisfy a specific need created by the dangerous conditions under which the former employee labored—to allocate to the mine operator an actual, measurable cost of his business.

In sum, the Due Process Clause poses no bar to requiring an operator to provide compensation for a

---

[18] Mr. Chief Justice Hughes, joined by Justices Brandeis, Stone, and Cardozo, dissented from the Court's invalidating the Railroad Retirement Act altogether, but agreed with the Court that the provision for allowances to former employees was arbitrary. 295 U. S., at 374, 389.

former employee's death or disability due to pneumoconiosis arising out of employment in its mines, even if the former employee terminated his employment in the industry before the Act was passed.

## V

We turn next to a consideration of the Operators' challenge to the "presumptions" and evidentiary rules governing adjudications of compensable disability under the Act.

## A

The Act prescribes two alternative methods for showing "total disability," which is a prerequisite to compensation. First, a miner is "totally disabled" under the definition contained in § 402 (f), if pneumoconiosis, simple or complicated,

> "prevents him from engaging in gainful employment requiring the skills and abilities comparable to those of any employment in a mine or mines in which he previously engaged with some regularity and over a substantial period of time." [19]

Second, if a miner can show by clinical evidence (ordinarily X-ray evidence) that he is afflicted with complicated pneumoconiosis, the incurable and final stage of the disease, then the miner is deemed to be totally disabled under § 411 (c)(3).[20] Thus, Congress has mandated that

---

[19] For the full text of § 402 (f) see n. 9, *supra*.

[20] Section 411 (c)(3), as set forth in 30 U. S. C. § 921 (c)(3) (1970 ed., Supp. IV), provides:

"[I]f a miner is suffering or suffered from a chronic dust disease of the lung which (A) when diagnosed by chest roentgenogram, yields one or more large opacities (greater than one centimeter in diameter) and would be classified in category A, B, or C in the International Classification of Radiographs of the Pneumoconioses by the International Labor Organization, (B) when diagnosed by biopsy or autopsy, yields massive lesions in the lung, or (C) when diagnosis is

the final stage of the disease is always compensable if its existence can be shown by positive clinical evidence, and that any stage of the disease is compensable when physically disabling under the terms of § 402 (f). The Operators maintain that both of these standards are constitutionally untenable.

(1)

The Operators contend that the definition of "total disability" set up in § 402 (f) is unconstitutionally arbitrary and irrational, because it provides for the compensation of former miners who might well be employable in other lines of work, and who therefore are not truly disabled by their mining-generated afflictions. We think it patent that this attack on § 402 (f) must fail. A miner disabled under § 402 (f) standards has suffered in at least two ways: His health is impaired, and he has been rendered unable to perform the kind of work to which he has adapted himself. Whether these interferences merit compensation is a public policy matter left primarily to the determination of the legislature. Cf. *Geduldig* v. *Aiello,* 417 U. S. 484 (1974). We cannot say that they are so insignificant as not to be a rational basis for compensation. Indeed, we long ago upheld against similar attack a workmen's compensation scheme providing benefits for injuries not depriving the employee of his ability to work. See *New York Central R. Co.* v. *Bianc,* 250 U. S. 596 (1919); cf. *Urie* v. *Thompson,* 337 U. S. 163, 181–187 (1949).

---

made by other means, would be a condition which could reasonably be expected to yield results described in clause (A) or (B) if diagnosis had been made in the manner prescribed in clause (A) or (B), then there shall be an irrebuttable presumption that he is totally disabled due to pneumoconiosis or that his death was due to pneumoconiosis or that at the time of his death he was totally disabled by pneumoconiosis, as the case may be."

(2)

The District Court, relying on such cases as *Stanley* v. *Illinois,* 405 U. S. 645 (1972), and *Vlandis* v. *Kline,* 412 U. S. 441 (1973), invalidated § 411 (c)(3)'s "irrebuttable presumption" of total disability due to pneumoconiosis based on clinical evidence of complicated pneumoconiosis. The presumption, the court explained,

> "forecloses all fact finding as to the effect of that disease upon a particular coal miner . . . . To the extent that such presumption purports to making a finding of total disability in terms other than those provided by [§ 402 (f)] as standards for total disability, it is unreasonable and arbitrary. As written, section [411 (c)(3)] is violative of due process in precluding the opportunity to present evidence as to the effect of a chronic dust disease upon an individual in determining whether or not he is disabled." 385 F. Supp., at 429–430.

We think the District Court erred in equating this case with those in the mold of *Stanley* and *Vlandis.*

As an operational matter, the effect of § 411 (c)(3)'s "irrebuttable presumption" of total disability is simply to establish entitlement in the case of a miner who is clinically diagnosable as extremely ill with pneumoconiosis arising out of coal mine employment.[21] Indeed, the

---

[21] Although the premise of § 411 (c)(3), that the miner have a "chronic dust disease of the lung," does not explicitly provide that the disease must be one arising out of employment in a coal mine, it is clear under § 422 (a), and hence under § 415 (a)(5) as well, that an operator can be liable only for pneumoconiosis arising out of employment in a coal mine. Section 422 (a), as set forth in 30 U. S. C. § 932 (a) (1970 ed., Supp. IV), provides that Part C liability "[shall] be applicable to each operator of a coal mine . . . with respect to death or total disability due to pneumoconiosis arising out of employment in such mine."

legislative history discloses that it was precisely this advanced and progressive stage of the disease that Congress sought most certainly to compensate.[22]   Were the Act phrased simply and directly to provide that operators were bound to provide benefits for all miners clinically demonstrating their affliction with complicated pneumoconiosis arising out of employment in the mines, we think it clear that there could be no due process objection to it.   For, as we have already observed, destruction of earning capacity is not the sole legitimate basis for compulsory compensation of employees by their employers. *New York Central R. Co.* v. *Bianc, supra.*   We cannot say that it would be irrational for Congress to conclude that impairment of health alone warrants compensation. Since Congress can clearly draft a statute to accomplish precisely what it has accomplished through § 411 (c) (3)'s presumption of disability, the argument is essentially that Congress has accomplished its result in an impermissible manner—by defining eligibility in terms of "total disability" and erecting an "irrebuttable presumption" of total disability upon a factual showing that does not necessarily satisfy the statutory definition of total disability.   But in a statute such as this, regulat-

---

[22] The original House and Senate bills that gave rise to the Conference bill enacted as Title IV of the Federal Coal Mine Health and Safety Act of 1969 each provided for compensation only for complicated pneumoconiosis.   H. R. 13950, 91st Cong., 1st Sess., §§ 112 (b) (1), (7) (B), as it passed the House, 115 Cong. Rec. 32061 (1969), contained the diagnostic criteria presently embodied in § 411 (c) (3), and deemed complicated pneumoconiosis to be "totally disabling" and compensable.   S. 2917, 91st Cong., 1st Sess., §§ 501–504, as amended on the floor, 115 Cong. Rec. 27632 (1969), and passed, *id.,* at 28243, established a program of interim benefits for total disability due to complicated pneumoconiosis, and directed the Secretary of Health, Education, and Welfare to develop standards for determining total disability due to complicated pneumoconiosis.

ing purely economic matters, we do not think that Congress' choice of statutory language can invalidate the enactment when its operation and effect are clearly permissible. Cf. *Weinberger* v. *Salfi*, 422 U. S. 749, 767–785 (1975); *McDonald* v. *Board of Election*, 394 U. S. 802, 809 (1969); *United States* v. *Carolene Products Co.*, 304 U. S. 144, 154 (1938).

(3)

In addition to creating an irrebuttable presumption of total disability, § 411 (c)(3) provides that clinical evidence of a miner's complicated pneumoconiosis gives rise to an irrebuttable presumption that he was totally disabled by pneumoconiosis at the time of his death, and that his death was due to pneumoconiosis. The effect of these presumptions, in particular the presumption of death due to pneumoconiosis, is to grant benefits to the survivors of any miner who during his lifetime had complicated pneumoconiosis arising out of employment in the mines, regardless of whether the miner's death was caused by pneumoconiosis. The Operators raise no separate challenge to these presumptions, and we would have no occasion to comment separately on them were it not for the Operators' general complaint against the application of the Act to employees who terminated their employment before the Act was passed. To the extent that the presumption of death due to pneumoconiosis is viewed as requiring compensation for damages resulting from death unrelated to the operator's conduct, its application to employees who terminated their employment before the Act was passed would present difficulties not encountered in our prior discussion of retroactivity. The justification we found for the retrospective application of the Act is that it serves to spread costs in a rational manner—by allocating to the operator an actual cost of his

business, the avoidance of which might be thought to have enlarged the operator's profits. The damage resulting from a miner's death that is due to causes other than the operator's conduct can hardly be termed a "cost" of the operator's business.

We think it clear, however, that the benefits authorized by § 411 (c)(3)'s presumption of death due to pneumoconiosis were intended not simply as compensation for damages due to the miner's *death,* but as deferred compensation for injury suffered during the miner's lifetime as a result of his illness itself. Thus, the Senate Report accompanying the 1972 amendments makes clear Congress' purpose to award benefits not only to widows whose husbands "[gave] their lives," but also to widows whose husbands "gave their health . . . in the service of the nation's critical coal needs." [23]

In the case of a miner who died with, but not from, pneumoconiosis *before* the Act was passed, the benefits serve as deferred compensation for the suffering endured by his dependents by virtue of his illness. And in the case of a miner who died with, but not from, pneumoconiosis *after* the Act was passed, the benefits serve an additional purpose: The miner's knowledge that his dependent survivors would receive benefits serves to compensate him for the suffering he endures. In short, § 411 (c)(3)'s presumption of death due to pneumoconiosis authorizes compensation for injury attributable to the operator's business, and viewed as such it poses no retroactivity problems distinct from those considered in our prior discussion.

It might be suggested that the payment of benefits to dependent survivors is irrational as a scheme of compensation for injury suffered as a result of a miner's disability. But we cannot say that the scheme is wholly

---

[23] S. Rep. No. 92–743, p. 8 (1972).

26

unreasonable in providing benefits for those who were most likely to have shared the miner's suffering. Nor can we say that the scheme is arbitrary simply because it spreads the payment of benefits over a period of time.[24]

We might face a more difficult problem in applying § 411 (c)(3)'s presumption of death due to pneumoconiosis on a retrospective basis if the presumption authorized benefits to the survivors of a miner who did not die from pneumoconiosis, and who during his life was completely unaware of and unaffected by his illness; or, in the case of a miner who died before the Act was passed, if the presumption authorized benefits to the survivors of a miner who did not die from pneumoconiosis, who nevertheless was aware of and affected by his illness, but whose dependents were completely unaware of and unaffected by his illness. But the Operators in their facial attack on the Act have not suggested that a miner whose condition was serious enough to activate the § 411 (c)(3) presumptions might not have been affected in any way by his condition, or that the family of such a miner might not have noticed it. Under the

---

[24] Under the present scheme, the payment of monthly benefits is not without limit. Section 422 (e), as set forth in 30 U. S. C. § 932 (e) (1970 ed., Supp. IV), quite clearly provides that "[n]o payment of benefits shall be required under this section . . . (2) for any period prior to January 1, 1974; or (3) for any period after twelve years after December 30, 1969." This time limitation, applicable in Part C cases by its terms, is also applicable to transition-period cases by virtue of § 415 (a)(5), 30 U. S. C. § 925 (a)(5) (1970 ed., Supp. IV). Thus, the operator is liable for monthly payments only for a period of eight years. The total amount payable to a single dependent survivor during this period, under current rates, is approximately $18,900. The maximum amount for which the operator would be liable, if the miner had four or more dependent survivors, is approximately $37,800. See n. 8, *supra*.

circumstances, we decline to engage in speculation as to whether such cases may arise.[25]

## B

Turning our attention to the statutory regulations of proof of § 402 (f) disability, we focus initially on the Operators' challenge to the presumptions contained in §§ 411 (c)(1) and (2). Section 411 (c)(1) provides that a coal miner with 10 years' employment in the mines who suffers from pneumoconiosis will be presumed to have contracted the disease from his employment.[26] Section 411 (c)(2) provides that if a coal miner with 10 years' employment in the mines dies from a respiratory disease, his death will be presumed to have been due to pneumoconiosis.[27] Each presumption is explicitly rebuttable, and the effect of each is simply to shift the burden of going forward with evidence from the claimant to the operator. See Fed. Rule Evid. 301.

[25] Our analysis of the retrospective application of the § 411 (c)(3) presumption of death due to pneumoconiosis is, of course, fully applicable to the retrospective application of any other provisions that might be construed to authorize benefits in the case of miners who die with, but not from, totally disabling pneumoconiosis. See §§ 422 (a), (c), 412 (a)(2), (3), (5), 411 (a), 30 U. S. C. §§ 932 (a), (c), 922 (a)(2), (3), (5), 921 (a) (1970 ed. and Supp. IV).

[26] Section 411 (c)(1), as set forth in 30 U. S. C. § 921 (c)(1) (1970 ed., Supp. IV), provides in full:

"[I]f a miner who is suffering or suffered from pneumoconiosis was employed for ten years or more in one or more coal mines there shall be a rebuttable presumption that his pneumoconiosis arose out of such employment."

[27] Section 411 (c)(2), as set forth in 30 U. S. C. § 921 (c)(2) (1970 ed., Supp. IV), provides in full:

"[I]f a deceased miner was employed for ten years or more in one or more coal mines and died from a respirable disease there shall be a rebuttable presumption that his death was due to pneumoconiosis."

We have consistently tested presumptions arising in civil statutes such as this, involving matters of economic regulation, against the standard articulated in *Mobile, J. & K. C. R. Co.* v. *Turnipseed,* 219 U. S. 35, 43 (1910):

> "That a legislative presumption of one fact from evidence of another may not constitute a denial of due process of law or a denial of the equal protection of the law it is only essential that there shall be some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate."

See *Atlantic Coast Line R. Co.* v. *Ford,* 287 U. S. 502 (1933); *Bandini Petroleum Co.* v. *Superior Court,* 284 U. S. 8, 19 (1931). See also *Leary* v. *United States,* 395 U. S. 6, 29–53 (1969); *Tot* v. *United States,* 319 U. S. 463, 467–468 (1943). Moreover, as we have recognized:

> "The process of making the determination of rationality is, by its nature, highly empirical, and in matters not within specialized judicial competence or completely commonplace, significant weight should be accorded the capacity of Congress to amass the stuff of actual experience and cull conclusions from it." *United States* v. *Gainey,* 380 U. S. 63, 67 (1965).

Judged by these standards, the presumptions contained in §§ 411 (c)(1) and (2) are constitutionally valid. The Operators focus their attack on the rationality of the presumptions' bases in duration of employment. But it is agreed here that pneumoconiosis is caused by breathing coal dust, and that the likelihood of a miner's developing the disease rests upon both the concentration of dust to which he was exposed and the duration of his exposure. Against this scientific background, it was not

beyond Congress' authority to refer to exposure factors in establishing a presumption that throws the burden of going forward on the operators. And in view of the medical evidence before Congress indicating the noticeable incidence of pneumoconiosis in cases of miners with 10 years' employment in the mines,[28] we cannot say that it was "purely arbitrary" for Congress to select the 10-year figure as a point of reference for these presumptions. No greater mathematical precision is required. Cf. *Lindsley* v. *Natural Carbonic Gas Co.*, 220 U. S. 61, 78 (1911).

The Operators insist, however, that the 10-year presumptions are arbitrary, because they fail to account for varying degrees of exposure, some of which would pose lesser dangers than others. We reject this contention. In providing for a shifting of the burden of going forward to the operators, Congress was no more constrained to require a preliminary showing of the degree of dust concentration to which a miner was exposed, a historical fact difficult for the miner to prove, than it was to require a preliminary showing with respect to all other factors that might bear on the danger of infection. It is worth repeating that mine employment for 10 years does not serve by itself to activate any presumption of pneumoconiosis; it simply serves along with proof of pneumoconiosis under § 411 (c)(1) to presumptively establish the cause of pneumoconiosis, and along with proof of death from a respiratory disease under § 411 (c)(2) to presumptively establish that death was due to pneumoconiosis. In its "rough accommodations," *Metropolis Theatre Co.* v. *Chicago*, 228 U. S. 61, 69 (1913), Congress was surely entitled to select duration of em-

---

[28] See, *e. g.*, Hearings on S. 355, *supra*, n. 1, at 699 (testimony of Dr. Werner A. Laqueur).

ployment, to the exclusion of the degree of dust exposure and other relevant factors, as signaling the point at which the operator must come forward with evidence of the cause of pneumoconiosis or death, as the case may be. We certainly cannot say that the presumptions, by excluding other relevant factors, operate in a "purely arbitrary" manner. *Mobile, J. & K. C. R. Co.* v. *Turnipseed, supra,* at 43.

The Operators press the same due process attack upon the durational basis of the rebuttable presumption in § 411 (c)(4), which provides, *inter alia,* that a miner employed for 15 years in underground mines, who is able to marshal evidence demonstrating a totally disabling respiratory or pulmonary impairment, shall be rebuttably presumed to be totally disabled by pneumoconiosis.[29]  Par-

---

[29] Section 411 (c)(4), as set forth in 30 U. S. C. § 921 (c)(4) (1970 ed., Supp. IV), provides in full:

"[I]f a miner was employed for fifteen years or more in one or more underground coal mines, and if there is a chest roentgenogram submitted in connection with such miner's, his widow's, his child's, his parent's, his brother's, his sister's, or his dependent's claim under this subchapter and it is interpreted as negative with respect to the requirements of paragraph (3) of this subsection, and if other evidence demonstrates the existence of a totally disabling respiratory or pulmonary impairment, then there shall be a rebuttable presumption that such miner is totally disabled due to pneumoconiosis, that his death was due to pneumoconiosis, or that at the time of his death he was totally disabled by pneumoconiosis.  In the case of a living miner, a wife's affidavit may not be used by itself to establish the presumption.  The Secretary shall not apply all or a portion of the requirement of this paragraph that the miner work in an underground mine where he determines that conditions of a miner's employment in a coal mine other than an underground mine were substantially similar to conditions in an underground mine.  The Secretary may rebut such presumption only by establishing that (A) such miner does not, or did not, have pneumoconiosis, or that (B) his respiratory or pulmonary impairment did not arise out of, or in connection with, employment in a coal mine."

ticularly in light of the Surgeon General's testimony at the Senate hearings on the 1969 Act to the effect that the 15-year point marks the beginning of linear increase in the prevalence of the disease with years spent underground,[30] we think it clear that the durational basis of this presumption is equally unassailable.

## C

The Operators also challenge § 413 (b) of the Act, which provides that "no claim for benefits . . . shall be denied solely on the basis of the results of a chest roentgenogram [X-ray]." [31]   Congress, of course, has plenary authority over the promulgation of evidentiary rules for the federal courts.  See, *e. g., Hawkins* v. *United States,* 358 U. S. 74, 78 (1958); *Tot* v. *United States,* 319 U. S., at 467; cf. *Lindsley* v. *Natural Carbonic Gas Co., supra,* at 81.  The Operators contend, however, that § 413 (b) denies them due process because X-ray evidence is frequently the sole evidence they can marshal to rebut a claim of pneumoconiosis.[32]  We conclude that, given Congress' reasoned reservations regarding the reliability of negative X-ray evidence, it was entitled to preclude exclusive reliance on such evidence.

Congress was presented with significant evidence demonstrating that X-ray testing that fails to disclose pneumoconiosis cannot be depended upon as a trust-

---

[30] See S. Rep. No. 92–743, p. 13 (1972).

[31] See n. 12, *supra.*

[32] The Operators frame their argument by saying that the effect of § 413 (b) is to render the rebuttable presumptions of § 411 (c) effectively irrebuttable.  But this dressing adds nothing.  Once it is determined that the limitation on X-ray evidence is permissible generally, it is irrelevant that the burden of going forward with some rebuttal evidence is thrown upon the operator by a permissible presumption rather than by the claimant's affirmative factual showing.

worthy indicator of the absence of the disease.[33]  In particular, the findings of the Surgeon General and others indicated that although X-ray evidence was generally the most important diagnostic tool in identifying the presence or absence of pneumoconiosis, when considered alone it was not a wholly reliable indicator of the *absence* of the disease; that autopsy frequently disclosed pneumoconiosis where X-ray evidence had disclosed none;[34] and that pneumoconiosis may be masked from X-ray detection by other disease.[35]

Taking these indications of the unreliability of negative X-ray diagnosis at face value, Congress was faced with the problem of determining which side should bear the burden of the unreliability.  On the one hand, preclusion of any reliance on negative X-ray evidence would risk the success of some nonmeritorious claims; on the other hand, reliance on uncorroborated negative X-ray evidence would risk the denial of benefits in a significant number of meritorious cases.  Congress addressed the problem by adopting a rule which, while preserving some of the utility, avoided the worst dangers of X-ray evidence.  Section 413 (b) does not make negative X-ray evidence inadmissible, or ineligible to be considered as ultimately persuasive evidence when taken together with other factors—for example, a low level of coal dust concentration in the operator's mine, a relatively short dura-

---

[33] Our attention has not been directed to any authoritative indications that X-ray evidence of the *presence* of pneumoconiosis is untrustworthy.

[34] Evidence was produced at the Senate hearings showing that in one study "approximately 25 percent of a random sample of some 200 coal miners whose medical records based upon X-ray findings showed no coal-worker's pneumoconiosis were found on post mortem examination to have the disease." S. Rep. No. 92–743, *supra*, at 12.

[35] *Id.*, at 9–16; H. R. Rep. No. 92–460, pp. 8–10 (1971).

tion of exposure to coal dust, or the likelihood that the miner is disabled by some other cause.[36]  The prohibition is only against sole reliance upon negative X-ray evidence in rejecting a claim.

The Operators attack the limitation on the use of negative X-ray evidence by suggesting that Congress' conclusion as to the unreliability of negative X-ray evidence is constitutionally unsupportable.  Relying on other evidence submitted to Congress in 1972,[37] the Operators contend that the consensus of medical judgment on the question is that good quality X-ray evidence does reliably indicate the presence or absence of pneumoconiosis.  In essence, the Operators seek a judicial reconsideration of the judgment of Congress on this issue.  But the reliability of negative X-ray evidence was debated forcefully on both sides before the Congress, and the Operators here suggest nothing new to add to the debate; they are simply dissatisfied with Congress' conclusion.  As we have recognized in the past, however, when it comes to evidentiary rules in matters "not within specialized judicial competence or completely commonplace," it is primarily for Congress "to amass the stuff of actual ex-

---

[36] Section 413 (b) directs additionally that

"[i]n determining the validity of claims under this part, all relevant evidence shall be considered, including, where relevant, medical tests such as blood gas studies, X-ray examination, electrocardiogram, pulmonary function studies, or physical performance tests, and any medical history, evidence submitted by the claimant's physician, or his wife's affidavits, and in the case of a deceased miner, other appropriate affidavits of persons with knowledge of the miner's physical condition, and other supportive materials." 30 U. S. C. § 923 (b) (1970 ed., Supp. IV).

[37] This evidence was brought to the hearings by the Social Security Administration, whose rules the § 413 (b) limitation was designed to overrule, and was credited by the minority of the House Committee on Education and Labor. H. R. Rep. No. 92-460, *supra*, at 22, 29-30.

perience and cull conclusions from it." *United States* v. *Gainey,* 380 U. S., at 67. It is sufficient that the evidence before Congress showed doubts about the reliability of negative X-ray evidence. That Congress ultimately determined "to resolve doubts in favor of the disabled miner" [38] does not render the enactment arbitrary under the standard of rationality appropriate to this legislation.

D

Finally, the Operators challenge the limitation on rebuttal evidence contained in § 411 (c)(4). That section, as we have indicated, provides that a miner employed for 15 years in underground mines who is able to demonstrate a totally disabling respiratory or pulmonary impairment shall be rebuttably presumed to be totally disabled by pneumoconiosis, and his death shall be rebuttably presumed to be due to pneumoconiosis. The final sentence of § 411 (c)(4) provides that

"[t]he Secretary may rebut [the presumption provided herein] only by establishing that (A) such miner does not, or did not, have pneumoconiosis, or that (B) his respiratory or pulmonary impairment did not arise out of, or in connection with, employment in a coal mine."

The effect of this limitation on rebuttal evidence is, *inter alia,* to grant benefits to any miner with 15 years' employment in the mines, if he is totally disabled by some respiratory or pulmonary impairment arising in connection with his employment, and has a case of pneumoconiosis. The Operators contend that this limitation erects an impermissible irrebuttable presumption, because it establishes liability even though it might be medically demonstrable in an individual case that the miner's

---

[38] S. Rep. No. 92–743, *supra,* at 11.

pneumoconiosis was mild and did not cause the disability—that the disability was wholly a product of other disease, such as tuberculosis or emphysema. Disability due to these diseases, as the Operators note, is not otherwise compensable under the Act.

The District Court, concluding that the quoted limitation on rebuttal evidence applied against an operator in a § 415 transition-period case, and recognizing that pneumoconiosis is not inherently disabling in the § 402 (f) sense, judged this limitation unconstitutional on the ground that it deprived an operator of a factual defense—that the miner is not "totally disabled" due to pneumoconiosis under § 402 (f). Additionally, reading the second part of the § 411 (c)(4) limitation on rebuttal to preclude an operator's defense that the disease did not arise out of employment in the particular mines for which it was responsible, the District Court found this aspect of § 411 (c)(4) unconstitutional as well.

The Federal Parties urge on their cross-appeal that these constitutional judgments are erroneous. We need not inquire into the constitutional questions raised by the District Court, however, because we think it clear as a matter of statutory construction that the § 411 (c) (4) limitation on rebuttal evidence is inapplicable to operators. By the language of § 411 (c)(4), the limitation applies only to "the Secretary" and not to an operator seeking to avoid liability under § 415 or § 422. And this plain language is fortified by the legislative history. The Senate Report on § 411 (c)(4) specifically states that the limitation on rebuttal applies to the Secretary of Health, Education, and Welfare, but nowhere suggests that it binds an operator.[39]

---

[39] *Id.,* at 12. Similarly, the Conference Report refers to the limitation only as running against "the Secretary." S. Conf. Rep. No. 92–780, p. 8 (1972); H. R. Conf. Rep. No. 92–1048, p. 8 (1972).

While apparently recognizing that the § 411 (c)(4) limitation on rebuttal evidence could not apply against an operator in a Part C determination, the District Court believed that the limitation bound an operator in the determination of a claim filed during the § 415 transition period, "[s]ince under section [415] the operator is bound by the Secretary's finding of liability under Part B." 385 F. Supp., at 430. In so concluding, the District Court was in error. First, it would appear, again from the plain language of the statute, that the reference to "the Secretary" in § 411 (c)(4) does not refer to the Secretary of Labor. On the contrary, § 402 (c), 30 U. S. C. § 902 (c), quite plainly defines "Secretary" when used in Part B, including § 411, as meaning the Secretary of Health, Education, and Welfare, not the Secretary of Labor. The Senate Report referred to above confirms this conclusion. Even assuming, however, that the § 411 (c)(4) limitation on rebuttal by "the Secretary" may be taken to bind the Secretary of Labor insofar as he was required to *pay* benefits for which the United States was liable during the transition period, § 415 (a)(1), we have found nothing in the statute or in its legislative history to suggest that an operator is similarly bound because the Secretary of Labor is also to *adjudicate* the operator's liability. § 415 (a)(5). Indeed, such a reading would render a mine operator bound by the rebuttal limitation in § 415 transition-period cases, although not so bound in cases filed thereafter under Part C. And that result would be contrary to the language of § 415 (a)(5), which prescribes that an operator "shall be bound by the determination of the Secretary of Labor [on a § 415 transition-period claim] as if the claim had been filed pursuant to part C."

In short, we conclude that the Act does not itself limit the evidence with which an operator may rebut the

§ 411 (c)(4) presumption. Accordingly, we vacate the order of the District Court declaring the § 411 (c)(4) limitation on rebuttal evidence unconstitutional and enjoining the Secretary of Labor from limiting evidence in rebuttal to the § 411 (c)(4) presumption. Cf. *Van Lare* v. *Hurley,* 421 U. S. 338, 344 (1975); *United States* v. *Munsingwear, Inc.,* 340 U. S. 36 (1950).

We are aware that regulations promulgated in 1972 by the Secretary of Health, Education, and Welfare under his § 411 (b) authorization, 20 CFR §§ 410.414, 410.454 (1975), applicable to Part C determinations under § 422 (h), and expressly adopted in 1973 by the Secretary of Labor, 20 CFR pt. 718 (1975), authorize limitations on rebuttal evidence similar to those contained in § 411 (c) (4), and appear to apply in determinations of an operator's liability. But the Operators' amended complaint never challenged the statutory or constitutional validity of these regulations.[40] Particularly in the absence of any mention of the regulations in the opinion and judgment of the District Court, or in the briefs and oral arguments of the parties, we find it inappropriate to consider their statutory or constitutional validity at this stage.[41]

---

[40] It follows from our discussion of the § 411 (c)(4) limitation on rebuttal that these regulations cannot stand as authoritative administrative interpretations of the statute itself. But the role of regulations is not merely interpretive; they may instead be designedly creative in a substantive sense, if so authorized. See, *e. g., Mourning* v. *Family Publications Service, Inc.,* 411 U. S. 356 (1973), If the regulations promulgated here are to be upheld, it must be in this latter sense.

[41] We see no reason to remand the case to the three-judge District Court for the purpose of determining whether the Operators should be granted leave to amend their complaint to include a statutory and constitutional challenge to the regulations. The three-judge court remanded to a single judge all questions regarding the validity of regulations challenged in the Operators' complaint, and that portion of the case is pending before a single judge. Any motion

## VI

In sum, the challenged provisions, as construed, are constitutionally sound against the Operators' facial attack. The judgment of the District Court as appealed from in No. 74–1316 is affirmed. The judgment of the District Court as appealed from in No. 74–1302 is reversed, except insofar as it declares unconstitutional, and enjoins the operation of, the limitation on rebuttal evidence contained in § 411 (c)(4) of the Act. In this latter respect, the judgment in No. 74–1302 is vacated, and the case remanded with directions to dismiss.

*It is so ordered.*

THE CHIEF JUSTICE concurs in the judgment.

MR. JUSTICE STEVENS took no part in the consideration or decision of these cases.

MR. JUSTICE POWELL, concurring in part and concurring in the judgment in part.

Appellants in No. 74–1316, the Operators, challenge as unconstitutional the retroactive obligations imposed on them by the Federal Coal Mine Health and Safety Act of 1969 (Act), 83 Stat. 792, as amended by the Black Lung Benefits Act of 1972, 86 Stat. 150, 30 U. S. C. § 901 *et seq.* (1970 ed. and Supp. IV). The Court rejects their contention in Part IV of its opinion. I concur in the judgment as to Part IV, and concur in other portions of the opinion not inconsistent with the views herein expressed.

## I

Coal miner's pneumoconiosis was not recognized in the United States until the 1950's, and there was no federal

for leave to amend the complaint to include a challenge to any additional regulations can be addressed to that single judge.

legislation providing benefits to its victims until the enactment of this statute in 1969. In Title IV of the Act, Congress significantly redefined the respective rights and obligations of miners and their employers in regard to this disease by establishing a benefits scheme to compensate victims of pneumoconiosis.[1] Under Title IV miners who filed claims before July 1, 1973, are to collect benefits from the Federal Government, §§ 411–414, 30 U. S. C. §§ 921–924 (1970 ed. and Supp. IV).[2] Miners filing claims after June 30, 1973, are to collect benefits until 1981, see *ante,* at 26 n. 24, from their individual employers. §§ 415, 421–431, 30 U. S. C. §§ 925, 931–941 (1970 ed. and Supp. IV).[3] Under the statute, the class of claimants to which individual employers are liable includes both (i) miners employed at the time of or after enactment and (ii) miners no longer employed in the industry at the time of enactment (former miners).

The unprecedented feature of the Act is that miners may be eligible to receive benefits from a particular coal-mining concern even if the miner was no longer employed in the industry at the time of enactment. The

---

[1] Title II of the Act prescribes the maintenance of less hazardous mine conditions in the future. § 201 *et seq.,* 30 U. S. C. § 841 *et seq.*

[2] As does the Court, I simplify by not distinguishing between claims by employees and claims by their survivors. See *ante,* at 15 n. 13.

[3] Claims filed between July 1, 1973, and December 31, 1973, were to be paid by the Federal Government until December 31, 1973, after which they became the responsibility of individual mining concerns. § 415, 30 U. S. C. § 925 (1970 ed., Supp. IV). Liability on the part of individual mining concerns arises only if the claimant does not have recourse to an applicable state workmen's compensation program approved by the Secretary of Labor, §§ 421–422, 30 U. S. C. §§ 931–932 (1970 ed. and Supp. IV), but no such state programs have been approved. See *ante,* at 8–9.

Department of Labor already has made initial determinations of liability against one of the Operators and in favor of claimants whose employment terminated decades ago.[4]

## II

The Operators do not challenge their liability to miners employed at the time of or after enactment, a liability which accords with familiar principles of workmen's compensation.[5] They contend, however, that a statutory liability to former miners has been imposed in violation of the Fifth Amendment guarantee against arbitrary, irrational, or discriminatory legislation, see, *e. g.,* *Richardson* v. *Belcher,* 404 U. S. 78, 81 (1971), as there

---

[4] Favorable initial determinations have been made for claimants who left mine work in 1923, 1927, 1931, 1932, 1937, 1943, 1946, and 1948. Brief for Operators 30 n. 1. These determinations rebut the federal parties' suggestion that in combination the initial period of federal liability and the statute of limitations specified in § 422 (f)(1), 30 U. S. C. § 932 (f)(1) (1970 ed., Supp. IV), will prevent employer liability to miners who left the industry before passage of the Act. See *ante,* at 16 n. 14.

[5] Congress apparently recognized that the employers burdened by retroactive liability were not blameworthy. Senator Javits, who played a significant role in the development of individual-employer liability, see Brief for Operators 34, thought that the "blame" for past neglect must be shared by "all of us," including "the industry, the medical profession, and the Government—particularly the Public Health Service." House Committee on Education and Labor, 91st Cong., 2d Sess., Legislative History/Federal Coal Mine Health and Safety Act 338 (Committee Print 1970), 115 Cong. Rec. 27627 (1969) (floor remarks).

The retroactive nature of the liability makes deterrence an insufficient justification. In their prospective application, it is rational for Title IV and other workmen's compensation schemes to disadvantage competitively employers who take less effective precautions to protect their employees. But only prospective liability creates an incentive for occupational safety measures.

is no rational justification for imposing liability to former miners upon individual mine owners.

The Court recognizes that its evaluation of the rationality of the employers' challenged liability must take into account the retroactive nature of the liability:

> "The retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former. Thus, in this case the justification for the retrospective imposition of liability must take into account the possibilities that the Operators may not have known of the danger of their employees' contracting pneumoconiosis, and that even if they did know of the danger their conduct may have been taken in reliance upon the current state of the law . . . ." *Ante,* at 17.

The Court then acknowledges that the Act would not be justified "on any theory of deterrence . . . or blameworthiness." *Ante,* at 17–18. It nonetheless sustains the provision for retroactive liability, reasoning as follows:

> "We find . . . that the imposition of liability for the effects of disabilities bred in the past is justified as a rational measure to spread the costs of the employees' disabilities to those who have profited from the fruits of their labor—the operators and the coal consumers." *Ante,* at 18.

> "We are unwilling to assess the wisdom of Congress' chosen scheme by examining the degree to which the 'cost-savings' enjoyed by operators in the pre-enactment period produced 'excess' profits, or the degree to which the retrospective liability imposed on the early operators can now be passed on to the consumer. It is enough to say that the Act approaches the problem of cost-spreading rationally . . . ." *Ante,* at 18–19.

In my view whether the retroactive liability is constitutional is a considerably closer question than the Court's treatment suggests. The rationality of retrospective liability as a cost-spreading device is highly questionable.

If coal-mining concerns actually enjoyed "excess" profits in the pre-enactment period by virtue of their nonliability for pneumoconiosis, and if such profits could be quantified in some discernible way, Congress rationally could impose retrospective liability for the benefit of the miners concerned. But, in this context, the term "excess profits" must mean profits over and above those that operators would have made in years and decades past if they had set aside from current operations funds sufficient to provide compensation, although under no obligation to do so. It is unlikely that such profits existed. The coal industry is highly competitive and prices normally are determined by market forces. One therefore would expect that, had a compensation increment been added to operating costs, the operators over the long term simply would have passed most of it on to consumers, thereby leaving their profitability relatively unaffected. In short, the talk of "excess profits" in any realistic sense is wholly speculative.

Nor can I accept without serious question the Court's view that the costs now imposed by the Act may be passed on to consumers. Firms burdened with retroactive payments must meet that expense from current production and current sales in a market where prices must be competitive with the prices of firms not so burdened. One ordinarily would expect that if burdened firms are to meet both competitive prices and their retroactive obligations, their profits necessarily will be less than those of their competitors. Thus, the burdened firms in all likelihood will have to bear the costs of the

retroactive liability rather than pass those costs on to consumers. And they must bear such costs quite without regard to whether "excess profits" may have been made in some earlier years.[6]

In some industries conditions might be such that the cost of retroactively imposed benefits could be spread to consumers. It seems most unlikely, however, that the coal industry is such an industry. A notable fact about coal mining is that the industry currently employs only about 150,000 persons, whereas in 1939 it employed nearly 450,000. Brief for Operators 24. The reduced scale of employment in the coal industry, combined with the liability to former miners and their survivors, means that retroactive obligations almost certainly will be disproportionate to the scale of current operations.[7] Moreover, it is unlikely that liability to former miners will be distributed randomly across the industry, as it is dictated by historical patterns that may be wholly unrelated to the present contours of the industry. Two examples are illustrative: (i) Some coal-mining concerns have been in the mining business for decades, while some competitors have commenced operation more recently. The exposure of the former group to claims of employees long separated from active employment is likely to be significantly

---

[6] It is, of course, impossible to spread the cost to "coal consumers" who "profited from the fruits of [former employees'] labor." *Ante,* at 18. A coal-mining concern cannot retroactively increase its prices to the former customers who benefited from the pre-1969 labors of former miners. The only consumers, therefore, who could bear these burdens are those who purchase coal currently. But in a free market such customers cannot be expected to pay a reparation add-on for coal produced by disadvantaged coal companies when the same product is readily obtainable from others at a lower price.

[7] Indeed, the number of former miners and survivors whom an individual employer is obliged to compensate could be larger than the employer's present work force.

greater than that of their competitors. (ii) Some companies engaged in coal mining in years past on a much larger scale and with many more employees than currently. This is not an unusual situation in a "depleting asset" industry, where smaller companies often lack the resources with which to continue the acquisition and development of new properties. Stronger competitors, on the other hand, may have operated on a constant or an increasingly large scale.[8] In each case the competitively disadvantaged companies may be unable to spread a substantial portion of their costs to consumers. In view of these considerations it is unrealistic to think that the Act will spread costs to "the operators and the coal consumers," *ante,* at 18, and thus I question the Court's conclusion that the Act is rational in imposing retroactive liability.

### III

Despite the foregoing, I must concur in the judgment on the record before us. Congress had broad discretion in formulating a statute to deal with the serious problem of pneumoconiosis affecting former miners. *E. g., Richardson* v. *Belcher,* 404 U. S. 78 (1971); cf. *Williamson* v. *Lee Optical Co.,* 348 U. S. 483 (1955). Nor does the Constitution require that legislation on economic matters be compatible with sound economics or even with normal fairness. As a result, economic and remedial social enactments carry a strong presumption of constitutionality, *e. g., United States* v. *Carolene Products Co.,* 304 U. S. 144, 148 (1938), and the Operators had the heavy burden of showing the Act to be unconstitutional.

---

[8] In addition, the incidence of liability to former miners may be skewed artificially by the regulation imposing liability upon the company which last employed the claimant without regard to previous employment with other companies. 20 CFR § 725.311 (1975). The validity of this regulation remains to be considered. See *ante,* at 14.

The constitutionality of the retrospective liability in question here ultimately turns on the sophisticated questions of economic fact suggested above, and these facts are likely to vary widely among the Operators.[9]  In this case, however, decided on the cross-motions for summary judgment, the Operators have failed to make any *factual* showings that support their sweeping assertions of irrationality.  Although I find these assertions strongly suggestive that Congress has acted irrationally in pursuing a legitimate end, I am not satisfied that they are sufficient—in the absence of appropriate factual support—to override the presumption of constitutionality.  Accordingly, I agree that the federal parties were entitled to summary judgment on this record.

MR. JUSTICE STEWART, with whom MR. JUSTICE REHNQUIST joins, concurring in part and dissenting in part.

While in all other respects joining the opinion and judgment of the Court, I cannot accept the Court's conclusion, *ante,* at 36–37, that the limitation on rebuttal evidence in § 411 (c)(4), 30 U. S. C. § 921 (c)(4) (1970 ed., Supp. IV), is inapplicable to "transition" determinations under § 415 insofar as those determinations bind operators.  Section 415 (a)(5), as set forth in 30 U. S. C. § 925 (a)(5) (1970 ed., Supp. IV), provides that an "operator . . . shall be bound by the determination of the Secretary of Labor [on a transition] claim as if the claim had been filed pursuant to part C of this subchapter and section 932 of this title had been applicable to such operator."  As the Court correctly observes, the critical question is thus whether the § 411 (c)(4) limi-

---

[9] I would not foreclose the possibility that a particular coal-mining concern, in a proper case, may be able to show that the impact of the Act on *its* operations is irrational.  Cf. *ante,* at 26–27.

tation would apply "if the claim had been filed pursuant to part C . . . and section 932 . . . ."

The Court reads the "plain language" of § 411 (c)(4), and in particular the reference to "the Secretary [of Health, Education, and Welfare]," to mean that "the limitation applies only to 'the Secretary' and not to an operator seeking to avoid liability under § 415 [30 U. S. C. § 925] or § 422 [30 U. S. C. § 932]." *Ante,* at 35. This reading, the Court concludes, is "fortified by the legislative history" and in particular by the "Senate Report on § 411 (c)(4) [which] specifically states that the limitation on rebuttal applies to the Secretary of Health, Education, and Welfare, but nowhere suggests that it binds an operator." *Ibid.*

The Court's analysis omits any consideration of the effect of § 430, as set forth in 30 U. S. C. § 940 (1970 ed., Supp. IV), which provides as follows:

> "The amendments made by the Black Lung Bene-
> fits Act of 1972 to part B of this subchapter shall,
> to the extent appropriate, also apply to [Part C]:
> *Provided,* That for the purpose of determining the
> applicability of the presumption established by sec-
> tion 921 (c)(4) of this title to claims filed under this
> part, no period of employment after June 30, 1971,
> shall be considered in determining whether a miner
> was employed at least fifteen years in one or more
> underground mines."

Since the limitation on rebuttal evidence in § 411 (c)(4) was created by the "amendments made by the Black Lung Benefits Act of 1972," it would seem to follow that the limitation applies to Part C determinations. This inference is reinforced by the Senate Report, which stated:

> "New section 430 requires that amendments to

part B be applied, wherever appropriate, to part C. . . .

"Questions were raised during the Committee deliberations over whether the amendments to part B would automatically be applicable, where appropriate, to part C.

.        .        .        .        .

"Although it would appear clear that the same standards are to govern, the Committee concluded that it would be best to so specify.

"It is contemplated by the Committee that the applicable portions of following sections of part B, as amended, would apply to part C: section 411, section 412 (except the last sentence of subsection (b) thereof), section 413, and section 414." S. Rep. No. 92–743, p. 21 (1972).

See also *id.,* at 33.

The only play in the tight linkage of Part C to the amendments to Part B is that afforded by the proviso in § 430 and by the phrase "to the extent appropriate" which appears in that section. The proviso does not remove the rebuttal limitation, but it does alter § 411 (c) (4)'s allocation of the burden of proof in another crucial respect: It limits the period of employment which may be considered for purposes of determining the applicability of the presumption. The presence of the proviso is relevant in two respects. First, it underscores the basic applicability to Part C determinations of the § 411 (c) (4) rebuttal presumption. Second, it demonstrates that Congress knew how to place a significant limitation on the applicability of that presumption when it chose to do so.

The care and precision which Congress used in drafting this qualifying language bears on the propriety of reading the phrase "to the extent appropriate" as obliquely qualifying the applicability of the rebuttal limitation to

Part C determinations. That limitation is part and parcel of an elaborate reallocation of the burden of proving disability resulting from pneumoconiosis. Under prior Social Security procedure "if an X-ray [did] not show totally disabling pneumoconiosis, no further processing of a claim [was] allowed. Thus, any further evidence of disability [was] not allowed if the X-ray show[ed] negative." S. Rep. No. 92–743, *supra,* at 11. This heavy reliance on X-ray evidence had unfortunate consequences for coal miners because of the inability of X-ray examinations to detect pneumoconiosis in some instances. Congress responded to this particular problem by

> "prohibiting denial of a claim solely on the basis of an X-ray, by providing a presumption of pneumoconiosis for miners with respiratory or pulmonary disability where they have worked 15 years or more in a coal mine, and by requiring the Social Security Administration to use tests other than the X-ray to establish the basis for a judgment that a miner is or is not totally disabled due to pneumoconiosis." *Ibid.*

The 15-year rebuttable presumption embodied in § 411 (c)(4) was perhaps the most significant feature of Congress' response. Based in part on testimony of the Surgeon General that "[f]or work periods greater than 15 years underground, there was a linear increase in the prevalence of the disease with years spent underground," S. Rep. No. 92–743, *supra,* at 13, the presumption embodied a congressional decision to "giv[e] the benefit of the doubt," *id.,* at 11, to a specific class of claimants totally disabled by respiratory or pulmonary impairments who could not prove by X-ray evidence that the impairment resulted from pneumoconiosis. The presumption was rebuttable only if the respondent could show either that "(A) such miner does not, or did not, have pneumoconiosis, or that (B) his respiratory or pulmonary impairment did not arise out of,

or in connection with, employment in a coal mine."
§ 411 (c)(4), 30 U. S. C. § 921 (c)(4) (1970 ed., Supp.
IV).

It is difficult to believe that Congress would have
used the phrase "to the extent appropriate" in § 430 to
withdraw the protection of the rebuttal limitation under
Part C while retaining the rebuttable presumption of
which it is an integral part. Such an interpretation is
inconsistent with the care Congress displayed in draft-
ing the § 430 proviso. Moreover, it leads necessarily to
other improbable results. The Court's approach, for in-
stance, necessarily implies that Congress extended the
benefit of the § 411 (c)(4) presumption to "surface, as
well as underground, miners [in specified circum-
stances]," S. Rep. No. 92–743, *supra,* at 2, with the inten-
tion that the protection would lapse as soon as Part C
came into play. The relevant sentence in § 411 (c)(4)
states that "[t]he *Secretary* [of Health, Education, and
Welfare] shall not apply all or a portion of the require-
ment of this paragraph that the miner work in an under-
ground mine where he determines that conditions of a
miner's employment in a coal mine other than an under-
ground mine were substantially similar to conditions in
an underground mine." (Emphasis added.) If the oper-
ative principle is that provisions in § 411 (c)(4) which
bind "the Secretary [of Health, Education, and Wel-
fare]" are automatically "inappropriate" for Part C pro-
ceedings, then surface miners would be stripped of the
benefits of § 411 (c)(4) as soon as the legislative scheme
enters its transitional stage.

Moreover, the Court's reading of the statute is
anomalous in terms of the overall structure of Part C.
The primary goal of Congress in framing Part C was to
transfer adjudicatory responsibilities over coal miners'
pneumoconiosis claims to state workmen's compensation
tribunals, but only if the state compensation law was

found by the Secretary of Labor to provide "standards for determining death or total disability due to pneumoconiosis . . . substantially equivalent to . . . those standards established under part B of this subchapter . . . ." § 421 (b)(2)(C), as set forth in 30 U. S. C. § 931 (b)(2)(C) (1970 ed., Supp. IV). One of the Part B standards is the rebuttal limitation in § 411 (c)(4). Thus, the Secretary of Labor would not be empowered to approve a state law which did not contain a "substantially equivalent" evidentiary limitation.

The delegation of adjudicatory responsibility to the Secretary of Labor under Part C was a backstop measure, intended to provide a forum for presentation of claims during any period after January 1, 1974, when a state workmen's compensation law was not included on the Secretary of Labor's list of state laws with provisions "substantially equivalent" to those in Part B. § 421 (a), 30 U. S. C. § 931 (a) (1970 ed., Supp. IV). See S. Rep. No. 92–743, *supra,* at 19–21. Since the very reason for withholding approval of a state law and providing an alternative federal forum is lack of "substantial equivalence" between the state-law provisions and the "standards established under part B," including the rebuttal limitation in § 411 (c)(4), it would be anomalous if the substitute federal forum could employ evidentiary rules which deviate substantially from those in Part B.

The statutory language and legislative history simply will not yield such an unlikely result. The phrase "to the extent appropriate" in § 430, 30 U. S. C. § 940 (1970 ed., Supp. IV), plainly refers to language in Part B which has no relevance to Part C, notably the language that specifies that "the Secretary [of Health, Education, and Welfare]" is to have certain adjudicative responsibilities. These are the references that are not "appropriate" under Part C, because Part C transfers adjudicative responsibilities to the States or, in the alternative,

to the Secretary of Labor. The obvious purpose of the phrase "to the extent appropriate" is to accommodate minor linguistic variations resulting from this transfer of responsibility. Thus, the interaction of the phrase "to the extent appropriate" and the reference to "the Secretary" in the rebuttal limitation of § 411 (c)(4) does not render the entire limitation "inappropriate" to Part C proceedings; it merely renders the reference to "the Secretary" inappropriate under Part C.

It is significant that the Court's interpretation of § 411 (c)(4)'s rebuttal limitation is not urged or even suggested by any party to this suit. The Federal Parties' position is that the District Court erred by reading § 411 (c)(4) to foreclose a showing that would refute total disability. That position is clearly correct. The § 411 (c)(4) presumption comes into play only after the claimant establishes total disability. See § 411 (c)(4), 30 U. S. C. § 921 (c)(4) (1970 ed., Supp. IV) ("and if other evidence demonstrates the existence of a totally disabling respiratory or pulmonary impairment, then there shall be a rebuttable presumption . . ."). In addition, the District Court ruled that § 411 (c)(4) places upon a specific coal mine owner the burden of proving that the respiratory or pulmonary disease did not arise out of coal mine employment. The Federal Parties urge that this construction is erroneous, because it overlooks the fact that under § 422 (c), 30 U. S. C. § 932 (c), a specific operator can also defeat liability by showing that the disability did not arise, even in part, out of employment in his mine during the period when he operated it. Again, the Federal Parties are clearly correct. If the operator makes the § 422 (c) showing, then the § 411 (c)(4) presumption—and the rebuttal limitation—is irrelevant. Accordingly, I would reverse the District Court's ruling that the § 411 (c)(4) rebuttal limitation violates the Constitution.