# Constitutionality of Repealing the Employee Protection Provisions of the Regional Rail Reorganization Act

Congress may modify or repeal altogether the income protection program enacted by Title V of the Regional Rail Reorganization Act of 1973, under which the Consolidated Rail Corporation (Conrail) was given responsibility for paying employee benefits under existing collective bargaining agreements between its five component railroads and their unions. Such action would not result in any constitutionally compensable "taking" from railroad employees, or impair any private contract rights in violation of the Due Process Clause.

Railroad employees have no present vested interest in the benefits specified in Title V whose abrogation or modification would be restricted by the Fifth Amendment, since by their nature those benefits are entirely prospective.

Congress may interfere with vested property rights, or impair a contract between two private parties, as long as the results are not harsh and oppressive, in light of the governmental interests served by the legislation. Moreover, a legislative measure interfering with contract rights is more likely to be held constitutional if it is one of a long series of actions regulating the business in question.

One Congress cannot legislate so as to divest itself or subsequent Congresses of the right and responsibility to exercise the full legislative authority to enact laws for the common good.

May 13, 1981

## MEMORANDUM OPINION FOR THE CHIEF COUNSEL, FEDERAL RAILROAD ADMINISTRATION

This responds to your request for our opinion on the constitutionality of repealing Title V of the Regional Rail Reorganization Act of 1973, *as amended,* 45 U.S.C. §§ 771–80 (the Rail Act), and enacting in its stead a more limited program of employee protection emphasizing severance payments rather than continuing monthly displacement allowances.[1] This proposed legislative action has been opposed by representatives of organized rail labor on the ground that it would deprive railroad employees of vested property rights in violation of the Fifth Amendment to the Constitution. You also ask whether Congress may, consistent with the Fifth Amendment, relieve the Consolidated Rail Corporation (Conrail) of certain obligations it may have to its employees under existing collective bargaining agreements. We conclude that

---

[1] While you do not describe in detail the program which is proposed to replace Title V, we have made some general assumptions about it based on the Department of Transportation draft bill entitled "Rail Service Improvement Act of 1981." *See infra.*

the Fifth Amendment poses no obstacle to the repeal of Title V, and that Congress may at the same time terminate or modify any analogous contractual obligations which Conrail may have towards its employees under collective bargaining agreements.

Our discussion begins with a brief review of the historical background of the enactment of Title V in 1973 and a summary of its most significant provisions. We then examine how the Fifth Amendment might be implicated in any repeal or substantial modification of those provisions.

## I. Factual Background

The Rail Act was enacted in 1973 in response to a crisis in northeast rail service which saw the eight major regional rail carriers all undergoing contemporaneous reorganization under the bankruptcy laws. Congress attempted to resolve this crisis by creating Conrail, a private, for-profit corporation authorized to purchase the assets of the bankrupt carriers and carry on their services, initially with federal assistance but eventually on a financially self-sustaining basis. *See Regional Rail Reorganization Act Cases,* 419 U.S. 102, 109–17 (1974). One of the most difficult problems faced by Congress in its efforts to accomplish this restructuring was rail labor's insistence on the continuation and strengthening, under its new employing entity Conrail, of the contractual protections rail employees had enjoyed under collective bargaining agreements with the eight bankrupt carriers. The solution eventually agreed upon was to make these protections binding on Conrail by incorporating them into the Rail Act itself as Title V.

The specific provisions of Title V were developed in negotiations, conducted at the behest of the Administration with the concurrence of congressional leaders, between representatives of rail labor unions and rail management.[2] The resulting hybrid approach to labor protection supplemented the contractual guarantees ordinarily secured by rail employees under § 5(2)(f) of the Interstate Commerce Act,[3] with a statu-

[2]This method of developing legislation, perhaps unique for the candor with which it was acknowledged in subsequent hearings and debates, is described in *Northeastern and Midwestern Rail Transportation Crisis: Hearings on S. 2188 and H.R. 9142 Before the Subcommittee on Surface Transportation of the Senate Commerce Committee,* 93d Cong., 1st Sess. 958–960 (1973) (Senate Hearings) (testimony of Stephen Ailes, President of the Association of American Railroads) *See also* 119 Cong. Rec. 36343, 37353, 36375, 40711, 40717 (1973).

[3]Section 5(2)(f), 49 U.S.C § 5(2)(f), *recodified without substantive change* as 49 U.S.C. § 11347 (Supp. II 1978), was added to the Interstate Commerce Act by the Transportation Act of 1940, ch. 722, 54 Stat. 898 (1940) It requires as a condition to the grant of a merger, consolidation, or acquisition that labor protection be guaranteed for a certain period (originally four, but now more generally six years) from the effective date of the transaction In *ICC v Railway Labor Ass'n,* 315 U.S. 373 (1942), the Supreme Court noted that the effect of the 1940 amendments was to make mandatory the protection of workers which had been discretionary under the 1936 Washington Job Protection Agreement between the carriers and rail unions. The "Washington Agreement" became the blueprint for a series of standard employee protections more or less routinely imposed by the Interstate Commerce Commission (ICC) in the event of any "joint action" by two or more rail carriers *See* discussion and cases cited in *New York Dock Railway* v. *United States,* 609 F.2d 83 (2d Cir. 1979). *See also* H.R. Rep No.

Continued

tory specification of Conrail's obligations in particular areas to the employees of the carriers it was absorbing.[4] Conrail itself was made subject to the Railway Labor Act by § 502(a) of the Rail Act, and required by § 504(a) to assume all obligations of acquired railroads under existing collective bargaining agreements except those relating to job stabilization. These latter were "superseded and controlled" by the detailed specifications of § 505, which included provisions for "monthly displacement allowances" (MDA's), separation and termination allowances, and a variety of transfer benefits. Section 509 made Conrail financially responsible for the payment of all allowances paid to employees pursuant to the Act, though provision was also made for reimbursement of those costs to Conrail from federal funds specially appropriated to the Railroad Retirement Board, in an aggregate amount not to exceed $250 million.[5]

The job stabilization provisions spelled out in § 505, particularly the monthly displacement allowances, are at the heart of what is now proposed to be changed in the Rail Act. It is therefore important to review at least briefly their history and substance.

At the time the Rail Act was being considered by Congress, most employees in the railroad industry were protected against loss of employment by provisions in collective bargaining agreements modeled on the 1936 Washington Job Protection Agreement. *See* note 3, *supra.* Under these agreements, layoffs as a result of a merger or other joint action were permitted, but protected employees were entitled to a "monthly displacement allowance" for a certain period afterwards (usually six years) while out of work. Most of the employees of the eight bankrupt northeastern carriers, however, enjoyed an assurance, derived from the Penn Central Merger Agreement of 1964, against loss of employment or reduction in compensation except in the most drastic circumstances of business downturn.

The extraordinary lifetime job security feature of the Penn Central Merger Agreement was the subject of considerable discussion during hearings in the Senate, where participants were virtually unanimous in stressing the importance of incorporating some equivalent protections in the restructuring program. *See, e.g.,* Senate Hearings, *supra* note 2, at 821-24 (colloquy among Department of Transportation officials and

---

1035, 96th Cong. 2d Sess. 139-45 (1980) (Staggers Rail Act of 1980). Under the Interstate Commerce Act, the actual terms of employee protection provisions are ordinarily negotiated between the rail carrier and its unions, subject to the approval of the ICC.

[4] Compare this substantive specificity with § 405 of the Rail Passenger Service Act of 1970 (the Amtrak Act), 45 U.S.C. § 565(b), which provides that employee protective arrangements negotiated between carriers and unions "shall in no event provide benefits less than those established pursuant to [§ 5(2)(f)]."

[5] The original authorization of $250 million to reimburse Conrail for the cost of labor protection has been exhausted. The Staggers Rail Act of 1980, Pub. L. No. 96-448, 94 Stat. 1895 (1980), modified certain of the provisions of § 505 to reduce the benefits available to employees, and authorized an additional $235 million to reimburse Conrail. We understand that not all of this amount has been appropriated, however, and that Conrail has not been reimbursed for recent labor protection payouts.

Senators Beall and Cook); 972–73 (testimony of Graham Claytor, President, Southern Railway System). In both House and Senate committee reports it was emphasized that railroad employees should not be required to bear a disproportionate share of the cost of continuing rail service in the northeast under Conrail. *See* H.R. Rep. No. 620, 93d Cong., 1st Sess. 58 (1973) ("the cost of employee protection in the restructuring of the rail system should be a social cost, borne by the federal government"); S. Rep. No. 601, 93d Cong. 1st Sess. 13–14 (1973) (describing Title V as "[p]roviding for these costs as an integral part of the restructuring effort . . . ."). The perception that employees of the bankrupt carriers to be acquired by Conrail enjoyed "vested rights" to permanent job security was shared by a number of active participants in the debates on the legislation in the House and Senate. Legislators supporting enactment of the negotiated protective provisions stressed what they perceived as the government's moral and legal obligation to offer employees displaced by the restructuring at least as much protection as they had had under the superseded collective bargaining agreements. *See* 119 Cong. Rec. 36375 (1973) (remarks of Rep. Staggers); 119 Cong. Rec. 40729–32 (1973) (remarks of Sen. Hartke).

The Statutory provisions negotiated by rail labor unions and management as a replacement for these "vested rights" gave Conrail employees the best of both worlds: the job stabilization provisions of § 505 grafted the open-ended lifetime employment assurance of the Penn Central Merger Agreement onto the heretofore limited concept of displacement allowances under the Washington Agreement. Thus, Conrail employees laid off or furloughed for any reasons and at any time were statutorily entitled to receive monthly displacement allowances until retirement.[6]

In 1980, the employee protection provisions in Title V were modified to eliminate some windfall benefit provisions, and generally to reduce the benefits available to certain classes of employees. *See* Pub. L. No. 96–448, 94 Stat. 1895 (1980). The legislation presently proposed by the Administration would effect a more basic change in the job stabilization structure established by the Act, replacing the monthly displacement allowances mandated by Title V with a scheme of severance payments. Conrail would remain bound by the terms of its existing labor contracts, and bound by the Railway Labor Act to bargain with its employees on all otherwise negotiable terms and conditions of employ-

---

[6] Under § 505(b) of the Rail Act, Conrail must pay to any protected employee who has been deprived of employment or adversely affected with respect to his compensation a monthly allowance in the full amount of his average monthly compensation for the preceding 12 months, including overtime, adjusted periodically to reflect subsequent general wage increases. The employee remains entitled to receive this allowance until he reaches age 65, though he must always remain available to return to work on peril of losing his entitlement. As an alternative, a protected employee may elect to resign and receive a lump-sum separation payment of as much as a year's salary. *See* § 505(e) and (f). In addition, Conrail employees transferred by the company are entitled to moving expenses, including compensation for any loss associated with the sale of an old home or the purchase of a new one. *See* § 505(d) and (g).

ment, except those withdrawn from the bargaining process by statute. As under present law, no collective bargaining agreement could include provisions relating to job stabilization which exceed or conflict with those established by statute. *See* 45 U.S.C. § 774(d). In short, the proposed legislation would eliminate rail employees' statutory entitlement to a monthly displacement allowance during periods of lay-off, and preclude their regaining this entitlement through the bargaining process.

## II. Fifth Amendment Issues Raised by the Proposed Repeal of Title V

Constitutional objection to the repeal or substantial modification of Title V would, we assume, be based on the Due Process or Just Compensation Clauses of the Fifth Amendment:[7]

> No person shall . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

These two clauses together place limits on Congress' power to structure and adjust economic benefits and burdens, either directly through the imposition of a regulatory system, or indirectly through the modification of existing contractual relationships including those to which the United States is a party.[8]

Where the constitutionality of legislation is at issue, the analysis under either the Due Process or Just Compensation Clause generally focuses on the source of Congress' power to legislate, the nature of the claimed legal interest, the way in which it is affected by the government's action, and the importance of the governmental purpose served.

---

[7] Changes in the protections afforded employees under Title V might also be subject to challenge on equal protection grounds. *See Hinds* v. *Conrail,* 518 F. Supp. 1350 (E.D. Mich. 1981) (suit challenging 1980 amendments to Title V as unfairly discriminatory against nonoperating employees). For such a challenge to succeed, it would be necessary to show that any benefit differentials among classes of employees are "patently arbitrary or irrational." *See U.S. Railroad Retirement Board* v. *Fritz,* 449 U.S. 166 (1980). We see no reason to believe that there would be any substantial basis for such a challenge to the amendments proposed here.

[8] The analysis which the Court has employed in contract impairment cases is similar to that employed in "taking" cases. The answer to the question whether and under what circumstances Congress may abrogate or modify rights arising under a contract between two private parties, or between a private party and the federal government, generally also disposes of the question whether there has been a constitutional "taking." Thus, a failure adequately to compensate for a governmental taking will often be analyzed as a failure of due process, either procedural or substantive. *See, e.g., Lynch* v. *United States,* 292 U.S. 571, 579 (1934) (Due Process Clause prohibits United States from abrogating its own valid contractual undertakings). Conversely, property rights may be "taken" without compensation "when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central Transp. Co.* v. *New York City,* 438 U.S. 104, 124 (1978). *See* Sax, *Takings and The Police Power,* 74 Yale L. J. 36, 61–62 (1964). In *Louisville & Nashville R.R. Co.* v. *Mottley,* 219 U.S. 467 (1911), the Supreme Court explained that property rights, including contractual property rights, are always "subject to the lawful demands of the Sovereign, so contracts must be understood as made in reference to the possible exercise of the rightful authority of the Government . . . ." 219 U.S. at 482, quoting from *Knox* v. *Lee,* 12 Wall. 457, 550–51 (1870).

In this case, Congress' power under the Commerce Clause to regulate employment relationships in the railroad industry is not disputed, nor is the importance of the government's interest in Conrail's solvency. Rather, the constitutional question turns on the nature of the rail employees' claimed interest in Title V benefits. Representatives of the rail unions characterize the employees' interest in Title V benefits as a "vested property right," obtained as compensation for relinquishing in 1973 their rights under the Penn Central Merger Agreement, and thus in the nature of a contract with the federal government itself which cannot be unilaterally altered.[9] In the view of the General Counsel of the Interstate Commerce Commission, the employees' interest in Title V benefits is most properly characterized as derived from and dependent upon their contractual relationship with the private entity Conrail.[10] Finally, Title V has been characterized as a "public benefit" program or "statutory entitlement" analogous to those established under the Social Security and Railroad Retirement Acts, and alterable for all practical purposes at the will of Congress.

While we do not find any of these characterizations a perfect fit, we think the last-mentioned comes closest to providing the correct framework for purposes of constitutional analysis. The fact that Congress in 1973 was willing to assure rail employees of some measure of income protection with their new employer, Conrail, does not lead inescapably, or even logically, to the conclusion that Congress was constitutionally *required* to do so. It is demonstrably not the case that the passage of the Rail Act in 1973 interfered with contract rights between the bankrupt railroads and their employees. The Rail Act simply created an opportunity for the railroads to sell their assets and operating rights to Conrail, free of the most burdensome aspects of their labor agreements. We have no doubt that it is within Congress' power to withdraw regulatory protections imposed by an agency pursuant to a statute (in this case the

---

[9] *See* undated memoranda entitled "Preliminary Memorandum—Legal Effects of Repeal of Title V of the 3R Act," and "Response to ICC Memorandum. . ." prepared by Highsaw & Mahoney, P.C., on behalf of the Railway Labor Executives' Association. We do not understand these memoranda to argue that Conrail employees have a compensable property interest in Title V benefits *independent* of the events of 1973. By their nature, MDAs and other Title V allowances are entirely prospective, and thus may be altered or eliminated without raising a Fifth Amendment problem. *Cf. Bell* v. *United States,* 366 U.S. 393 (1961). Because availability for active employment is a condition of continuing eligibility for MDAs and the other statutory allowances provided in Title V, they must be regarded as compensation for present rather than past services. A rail employee's interest in displacement allowances may thus be analogized to the interest of a retired military officer serving in the active reserve in his retirement pay. *See Abbott* v. *United States,* 200 Ct. Cl. 384 (1973); *Akerson* v *United States,* 175 Ct Cl. 551, *cert. denied,* 385 U.S. 946 (1966). The case of *United States* v *Larionoff,* 431 U S 864 (1977) is thus inapposite, at least insofar as it indicates that an employee who performs services in reliance upon a government promise to pay a certain sum is constitutionally entitled to be paid that amount

[10] Memorandum from the General Counsel to the Acting Chairman, March 12, 1981, "Constitutionality of Legislation Amending Title V of the Regional Rail Reorganization Act of 1973. . . ." We understand the General Counsel's argument to be that Title V was intended by Congress to create a contractual obligation on the part of Conrail towards its employees; therefore, analysis of its repeal or modification by Congress would be similar to that applicable to the legislative impairment of a purely private contract between Conrail and its unions. *See* part III, *infra.*

135

ICC's longstanding requirement that the cost of existing labor agreements be included in a sale of assets). What Congress chose to substitute for the ICC's requirement was a statutory income protection program whose benefits, like those paid under the Social Security and Railroad Retirement Acts, "are not contractual and may be altered or even eliminated at any time." *U.S. Railroad Retirement Board* v. *Fritz,* 449 U.S. at 174. Railroad employees thus have no constitutionally compensable property right in Title V benefits, and no expectation of their continuance whose unsettling offends substantive due process. *See Flemming* v. *Nestor,* 363 U.S. 603, 608–11 (1960) (Social Security annuitants have no vested rights to receive benefits). *See also Hisquierdo* v. *Hisquierdo,* 439 U.S. 572, 575 (1979) (similar treatment of Railroad Retirement benefits). Modification of the benefits scheme mandated by Title V is well within Congress' power to "adjust[ ] the burdens and benefits of economic life" in a reasonable manner, even if it thereby "upsets otherwise settled expectations." *Usery* v. *Turner Elkhorn Mining Co.,* 428 U.S. 1, 16–17 (1975).[11]

Indeed, we believe the Fifth Amendment claims of Title V beneficiaries are even less compelling than those of Social Security Act and Railroad Retirement Act annuitants, since Title V benefits—and their proposed alteration—operate in an entirely prospective fashion. *See* note 9, *supra.* The Supreme Court has indicated that the Due Process Clause requires measures that interfere with rights previously acquired to be more strongly justified than legislation which effects mere expectations. *See Usery* v. *Turner Elkhorn Mining Co.,* 428 U.S. at 17; *Railroad Retirement Board* v. *Alton R. R. Co.,* 295 U.S. 330, 348–50 (1935). But even if the interest of rail employees in Title V benefits were thought as substantial as the interest of annuitants under the Social Security and Railroad Retirement Acts, they would be entitled to protection only from "patently arbitrary" congressional action, action which is "utterly lacking in rational justification." *Flemming* v. *Nestor,* 363 U.S. at 611. We have no reason at this point to doubt Congress' ability to frame legislation which would meet that test.

As noted above, we do not believe Title V creates a present property interest in rail employees which would be enforceable against the fed-

---

[11] We do not think it is material to this analysis whose responsibility it may be under a statute for the actual payment of benefits. As previously noted, Congress expressly made a non-government entity, Conrail, responsible for paying Title V benefits, though it also agreed to underwrite some portion of Conrail's costs in this respect. Similarly, under the Black Lung Benefits Act held constitutional in *Turner Elkhorn,* the federal government assumed responsibility for paying certain claims, and assigned to the states and to the mine operators responsibility for paying others. Benefits paid out under the Social Security and Railroad Retirement Acts have a similarly hybrid source. Under none of these statutes did the substantive validity of a beneficiary's claim depend upon who ultimately could be made to pay it; the fact that the entitlement was assured in a federal statute was sufficient to establish the constitutional issue. In any event, the fact that Conrail, rather than the federal government, is responsible under the statute for paying claims cannot be said to strengthen the case *against* Congress' present authority to modify Conrail's obligations. *Cf. Lynch* v. *United States, supra,* 292 U S. 571.

eral government through either the Due Process or Just Compensation Clauses. We recognize, however, that there is support in the legislative history of the Rail Act for a theory that Congress intended Title V benefits as compensation for employees' loss of private contract rights under the Penn Central Merger Agreement. There is also some support for a theory that Title V was enacted in consideration of the rail unions' promise not to strike or otherwise disrupt the restructuring effort, and that it therefore constitutes a sort of legislative contract which Congress may not unilaterally abrogate or even alter without adequate compensation.[12]

With respect to the latter theory, we think it clear that under the Constitution one Congress cannot legislate so as to divest itself or subsequent Congresses of the right and responsibility to exercise the full legislative authority to enact laws for the common good. *See Pennsylvania Hospital* v. *Philadelphia,* 245 U.S. 20, 23 (1917). *See also Home Building & Loan Ass'n* v. *Blaisdell,* 290 U.S. 398, 435 (1934) ("the reservation of essential attributes of sovereign power is . . . read into contracts as a postulate of the legal order."). Those cases in which the United States has been held to the performance of its part of a contract authorized under a law of Congress, *e.g., Lynch* v. *United States, supra,* 292 U.S. 571, and *Perry* v. *United States,* 294 U.S. 330 (1935), cast no doubt on this fundamental principle of government. Both *Lynch* and *Perry* involved contracts entered into by the United States extrinsic to the law which authorized them, under which claimants were found to have vested property rights. We know of no instance in which Congress was held to be disabled from legislating under one of its enumerated powers because of a proposed new law's effect on some expectation of future benefits arising under existing law. Indeed, we know of no situation in which legislation by itself was held to confer a contractual benefit.[13] And, even when dealing with legislative programs whose beneficiaries' earned interest is arguably quite strong, the Supreme Court has tended to defer to Congress in recognition that those programs rest "on judgments and preferences as to the proper allocation of the Nation's resources which evolving economic and social conditions will of necessity in some degree modify." *Flemming* v. *Nestor,* 363 U.S. at 610.

---

[12] It is noteworthy in this regard that no due process argument has to date been advanced in the suit challenging the change in benefits mandated by the 1980 amendments to Title V. *See* note 7, *supra.*

[13] In *Larionoff* v. *United States,* 431 U.S. 864, 869 (1977), the Supreme Court reaffirmed the established rule that a federal employee's claim to wages "must be determined by reference to [statutes and regulations], rather than to ordinary contract principles." In *Larionoff,* one of the plaintiffs had signed an agreement reenlisting in the military with the expectation that he would receive a statutory reenlistment bonus which was subsequently abolished. While the Court was able to avoid deciding the constitutional issue in this case, it pointed to the "serious constitutional questions" which would have been presented by an attempt to "deprive a service member of pay due for service already performed, but still owing " 431 U.S. at 879. At the same time, it noted that "[n]o one disputes that Congress may prospectively reduce the pay of members of the Armed Forces, even if that reduction deprived members of benefits they had expected to be able to earn." *Id.*

137

Finally, we come to the theory that Title V was intended by Congress to compensate rail employees for loss of private contract rights, whose benefit structure cannot now be altered without effecting a new "taking." In order to prevail under such a theory, the employees would have to show that they had a valuable property right which was in fact constitutionally "taken" by Congress in 1973. As discussed above, we doubt that such a showing could be made. *Compare United States* v. *Sioux Nation of Indians,* 448 U.S. 371, 407-21 (1980). Assuming, however, that the statements of some legislators on the floor of Congress were in 1973 accepted as a legally accurate characterization of Congress' intent in enacting Title V, the employees would still have to show that the private contract rights they gave up in 1973 were in fact worth what they are now claiming is due them. *See United States* v. *General Motors Corp.,* 323 U.S. 373, 379 (1945). That is, they would have to establish the fair market value of their 1973 rights under the Penn Central Merger agreement and show at a minimum that those rights were greater than the value of the allowances they have already received under the Act. The legal standard applied to test the adequacy of compensation in taking cases is whether the payment was "fair, just, and equitable." *Choctaw Nation* v. *United States,* 119 U.S. 1, 35 (1886). *See also Duke Power Co.* v. *Carolina Environmental Study Group, Inc.,* 438 U.S. 59 (1978) (Price-Anderson Act limiting nuclear plant operators' liability provides a "reasonably just substitute" for tort law remedies it replaced).

While the question of value is always one of fact and one for a court rather than the legislature to decide, *Monongahela Navigation Co.* v. *United States,* 148 U.S. 312, 327 (1893), we think that in this case a court would find persuasive the value Congress itself placed on rail labor's rights in 1973, at least insofar as it believed those rights were constitutionally required to be compensated at that point in time. In this regard, the terms of the statute and its legislative history make clear that the federal financial commitment to Conrail employees was not an open-ended one. Section 509 authorizes the Railroad Retirement Board to reimburse Conrail for payments to employees in an amount "not to exceed the aggregate sum of $250,000,000 . . ." The legislative history makes clear Congress' intent to limit the exposure of the federal treasury to employee claims under the Act to this amount, an amount regarded even by the most enthusiastic supporters of railroad employees in Congress as sufficient to satisfy whatever obligation the taxpayer might have to subsidize the cost of those employees' dislocation. *See, e.g.,* 119 Cong. Rec. 40,716-20 (1973). Senator Hartke, for example, after expressing the view that Congress' failure adequately to compensate rail employees for their willingness to forgo rights under the Penn Central Merger Agreement might result in a suit in the Court of Claims, himself sponsored the amendment which incorporated the

$250 million reimbursement limitation into § 509. *See* 119 Cong. Rec. 40,720 (1973). In doing so, he made clear his intention that this sum should represent the extent of the federal government's responsibility toward rail employees. *See* 119 Cong. Rec. 40,729–32 (1973).[14]

In summary, the legislative restructuring of the northeast rail system accomplished by the Rail Act resulted in no constitutionally compensable "taking" from railroad employees, and did not impair private contract rights in violation of the Due Process Clause. Moreover, railroad employees have no present vested property interest in the benefits specified in Title V whose abrogation or modification would be prohibited under the Fifth Amendment. If Congress in 1973 committed itself to subsidize some portion of the labor costs associated with the restructuring of rail service under Conrail, that commitment has by now been fully satisfied. As long as legislation is not enacted in an irrational or arbitrary manner, and the burdens imposed on rail labor are not objectively "harsh and oppressive," Congress may take what steps it believes are necessary in order to ensure the continued efficient functioning of rail service in the northeast.

## III. Whether Congress May Abrogate or Impair the Value of a Contract Between Conrail and Its Employees [15]

The final question you have asked us relates to the claimed existence of present contractual rights to allowances, equivalent to those specified in Title V, but existing independent of the statute, derived from collective bargaining agreements between Conrail and some of its employees.[16] You have asked us to advise you, assuming the existence of such

---

[14] Senator Hartke stated that he did not think there was "even the slightest indication that there is a requirement by Congress to reimburse [Conrail] in an amount in excess of $250 million," 119 Cong. Rec. 40718 (1973), and denied that the law would "bind a subsequent Congress to anything." *Id.* at 40,720 The fact that a new authorization in 1980 increased the federal funds potentially available to pay Title V claims has no bearing on Congress' understanding in 1973 that the sum it was then authorizing was sufficient to satisfy any obligation it might have, under the Fifth Amendment or otherwise, to employees of the restructured railroad system. While it is open to rail employees to claim that their property rights under the Penn Central Merger Agreement were undervalued by Congress in 1973, or that they are somehow otherwise constitutionally entitled now to additional compensation, the burden would be upon them to show that what they have received to date is of less value than what they gave up in 1973.

[15] The constitutional permissibility of contract impairment through legislation has been implicated in several other contexts in connection with the general problem of repealing Title V. As previously discussed, the rail unions claim that Title V was enacted in the first place as compensation for a "taking" arising from contract impairment in 1973. And, the ICC General Counsel has characterized Title V itself as a kind of legislative contract between two private parties, Conrail, and its employees. The analysis developed in this section, while specifically addressed to the proposed modification of present rights under Conrail's collective bargaining agreements, is applicable as well to alleged impairments in these other contexts.

[16] For example, Rule 62 of the contract between Conrail and the Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees (BRAC) states that "[p]rotected employees will be afforded the benefits as provided in Appendix No. 8 or No. 9, whichever is applicable." These appendices reproduce the terms of Title V.

139

private contractual rights, whether Congress may relieve Conrail of its obligations by statute consistent with the Fifth Amendment.[17]

While we doubt that a court would regard the displacement allowances mandated by Title V as a property interest, *see* note 9 *supra*, the cases indicate that the legislature may interfere with even ripened contractual entitlements or other property rights so long as the results are not "particularly 'harsh and oppressive,'" *Unites States Trust Co.* v. *New Jersey*, 431 U.S. 1, 17 n.13 (1977), quoting *Welsh* v. *Henry*, 305 U.S. 134, 147 (1938),[18] and that federal legislation affecting existing contract rights can be highly burdensome so long as the burden is not imposed irrationally or arbitrarily. *Usery* v. *Turner Elkhorn Mining Co.*, 428 U.S. at 17–19. In deciding whether legislation is "harsh and oppressive," the courts have focused not only on the party complaining that his contractual rights have been impaired, but also on the governmental interests furthered by the legislation and efficacy with which it furthers those interests. *See, e.g., Welsh* v. *Henry*, 305 U.S. at 146–57; *Louisville & Nashville R.R. Co.* v. *Mottley*, 219 U.S. at 474.

We would add that a legislative measure interfering with contract rights is more likely to be held constitutional if it is "one of a long series" of actions "regulating the many integrated phases of the . . . business" in question. *Veix* v. *Sixth Ward Building and Loan Ass'n*, 310 U.S. 32, 37 (1940). *See Allied Structural Steel* v. *Spannaus*, 438 U.S. 234, 249 (1978). Persons who are frequently and closely regulated know, and can anticipate, that any commitments they may make and any commitments made to them may well be affected by "further legislation upon the same topic." *Veix* v. *Sixth Ward Building and Loan Ass'n*, 310 U.S. at 38. *See also United States Trust Co.* v. *New Jersey*, 431 U.S. at 19 n. 17; *Norman* v. *Baltimore & Ohio R.R. Co.*, 294 U.S. 240, 308 (1935).

Management-labor relations in the railroad industry have been the subject of federal regulation at least since the mid-1930's and closely monitored by the Interstate Commerce Commission for over 40 years. *See* note 3, *supra*. More recently, labor contracts negotiated on railroads subject to the Rail Passenger Service Act of 1970 have been required to be certified by the Secretary of Labor. *See* 45 U.S.C. § 565. And, in the past several years Congress has imposed explicit and detailed labor

---

[17] We note that under § 453(b) of the Administration's proposed legislation, any railroad acquiring operating rights from Conrail could not be required to assume obligations under any contract between Conrail and its employees. If Congress may release Conrail from its own contractual undertakings, *a fortiori* it may take steps to ensure a similar latitude for railroads succeeding to Conrail's interest by limiting the authority of the ICC.

[18] *United States Trust Co.* and *Welsh* dealt with state efforts to affect obligations created by contracts. Such efforts are restricted not just by the Due Process and Just Compensation Clauses but by the more specific constitutional injunction that "No State shall . . pass any . . . Law impairing the Obligation of Contracts . ." Art. I. § 10, cl. 1. This specificity suggests, and the Supreme Court has confirmed, that states have less latitude in imparing contract rights than does the federal government. *Compare Allied Structural Steel* v. *Spannaus*, 438 U.S. 234 (1978), with *Usery* v *Turner Elkhorn Mining Co., supra*, 428 U.S. 1. If legislative repeal of Title V can satisfy the standards applied to state interference with private contract rights, *a fortiori* it meets the constitutional standards governing federal statutes.

protective conditions on railroads undergoing reorganization under the bankruptcy laws, or in liquidation. *See* Pub. L. No. 96–101, 93 Stat. 736 (1979) (Milwaukee Railroad Restructuring Act); Pub. L. No. 96–254, 94 Stat. 399 (1980) (Rock Island Railroad Transition and Employee Assistance Act).[19] Rail employees can scarcely claim that a further reordering of their contractual rights vis-a-vis their employer could not have been anticipated.

LARRY L. SIMMS

*Deputy Assistant Attorney General*

*Office of Legal Counsel*

---

[19] The labor protection provisions of the Rock Island Act, as amended and reenacted by the Staggers Rail Act, Pub. L. No. 96–448, 94 Stat. 1959 (1980), have been declared unconstitutional and enjoined as a taking of the property rights of creditors, in violation of the Just Compensation Clause. *See In re Chicago, R.I. & P.R. Co.,* 645 F.2d 74 (7th Cir. 1980) (en banc), *aff'g mem.,* Civ. No. 75–B–2697 (N.D. Ill., Oct. 15, 1980). This case has been appealed to the Supreme Court, and probable jurisdiction noted. 451 U.S. 936 (1981) (Nos. 80–415 and 80–1239). [NOTE: The Supreme Court's decision in this case found the provisions at issue repugnant to the Bankruptcy Clause of the Constitution, Art I, § 8, cl. 4, and affirmed the court of appeals without deciding the issues raised by the plaintiffs under the Just Compensation Clause and several other constitutional provisions. *Railway Executives Ass'n* v. *Gibbons,* 455 U.S. 457, 465 (1982). Ed ]

141