Grover W. HARRIS, Petitioner,

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR, Respondent.

No. 91–1215.

United States Court of Appeals, Fourth Circuit.

Argued March 31, 1993.

Decided Aug. 20, 1993.

---

Bobby S. Belcher, Jr., Wolfe & Farmer, Norton, VA, argued (Vernon Mandel Williams, on brief); for petitioner.

Barry H. Joyner, U.S. Dept. of Labor, Washington, DC, argued (Marshall J. Breger, Deputy Sol. of Labor, Donald S. Shire, Associate Sol., Michael J. Denney, Counsel for Appellate Litigation, on brief); for respondent.

Before PHILLIPS and WILKINSON, Circuit Judges, and SPROUSE, Senior Circuit Judge.

## OPINION

WILKINSON, Circuit Judge:

Petitioner Grover W. Harris contests the denial of his application for benefits under the Black Lung Benefits Act, 30 U.S.C. § 901 *et seq.* An administrative law judge determined that Harris' later employment as a federal mine inspection supervisor was gainful and comparable to his previous work as a mine electrician, and therefore, that Harris did not qualify for benefits. 20 C.F.R. § 727.203(b)(1). In reaching this conclusion, the ALJ compared several different aspects of the jobs, including the skills, abilities, and exertion needed to perform each. Harris argues that in so doing, the ALJ applied an incorrect legal standard for determining what is comparable and gainful employment, and that the evidence in the record does not support the ALJ's finding. Because we hold that the ALJ applied the appropriate standard and that substantial evidence supports the decision, we affirm the judgment.

## I.

From 1945 to 1966, Harris worked as a coal miner, usually as a mine electrician. This work involved repairing a variety of electrical, hydraulic, and mechanical equipment, along with the use of a variety of machines and tools. The work required technical knowledge of both the equipment to be fixed and the tools used in making repairs, as well as special skills in working with electricity. According to Harris, the work entailed a lot of lifting, carrying, and working from a variety of cramped positions. He also routinely had to walk, stand, sit, stoop, bend, and kneel.

In 1966, Harris left private employment in the coal mining industry to become a federal mine inspector. In 1978, he advanced to become a federal mine inspection supervisor. In this capacity, Harris oversaw the tasks of an office clerk and five inspectors, including assigning the inspections to be performed and accompanying inspectors into the mines. According to Harris, this job entailed more supervisory skills than being a mine electrician. The job still involved technical knowledge of machinery and electricity, however, and Harris testified that he went underground in the mines two to three times a quarter, occasionally going into "low" coal. The job required walking, standing, sitting, stooping, bending, and kneeling. It also required some crawling and some climbing of ladders. Harris also testified that while in the mines he had to carry a large self-rescuer, a smaller rescuer, a safety light, a methane detector, and various other equipment.

Harris initially filed for black lung benefits with the Social Security Administration in 1973. After his claim was denied administratively by both the SSA and the Department of Labor, Harris eventually sought an administrative hearing, which took place in 1986. The ALJ found that Harris had invoked the interim presumption of total disability due to

pneumoconiosis, based on x-ray evidence. 20 C.F.R. § 727.203(a)(1). The ALJ then found that Harris' employment as a federal mine inspection supervisor served to rebut the presumption. According to the ALJ, this work required skills, abilities, and physical exertion comparable to being a mine electrician and thus it constituted comparable and gainful work for purposes of rebuttal under § 727.203(b)(1). Accordingly, the ALJ denied Harris' claim.

Harris appealed to the Benefits Review Board. The Board concluded that substantial evidence supported the ALJ's decision, and affirmed the denial of benefits. Harris then appealed to this court.

## II.

■ Harris argues that being a federal mine inspection supervisor is in no way comparable to being a mine electrician, and that the ALJ erred in concluding that it was. Harris primarily attacks the ALJ's factual finding that comparable physical and mental abilities were needed to perform the two jobs. Harris also argues that the ALJ applied the wrong legal standard for determining what is "comparable" work under § 727.203(b)(1). We disagree with both of these contentions.

### A.

First, the ALJ applied the correct legal standard. In his brief, Harris argues that the ALJ improperly applied the standard adopted by the Third Circuit in *Echo v. Director, Office of Workers' Comp. Programs*, 744 F.2d 327 (3d Cir.1984). The Third Circuit listed several relevant factors in considering employment comparability, but considered "compensation to be the prime criterion of comparability" because all other factors are "reflected in the level of compensation." 744 F.2d at 331. Harris contends that instead of relying on compensation, we should adopt the Sixth Circuit's standard from *Ratliff v. Benefits Review Bd.*, 816 F.2d 1121 (6th Cir.1987). In *Ratliff,* the Sixth Circuit mentioned comparing skills and abilities, but focused almost exclusively on determining if the two jobs required similar levels of physical exertion. 816 F.2d at 1125.

Our dissenting brother would also make the level of physical exertion the crucial factor. *See* Discussion in dissenting op. at 109 & 110–11. We think, however, that there are several reasons why the inquiry is more complicated. First, the language of § 727.203(b)(1) does not focus exclusively on the level of physical exertion. The language of "comparable and gainful work" was presumably chosen for a purpose, and courts are not at liberty to elevate a single point of comparability to the detriment of the more generalized inquiry that the regulation's language plainly invites. Second, a focus solely on physical exertion ignores the fact that persons in later life may choose employment that requires less exertion. Such choices may have everything to do with the general process of aging and little to do with disability from pneumoconiosis. Third, factors other than physical exertion are plainly relevant to the intermediate inquiry on the nature of the employment, as well as to the ultimate legal standard of whether a miner is "totally disabled due to pneumoconiosis." 30 U.S.C. § 901(a); 20 C.F.R. § 727.201. If a claimant, for example, is able to perform work requiring the exercise of substantial skills and entailing substantial responsibilities, that is at least relevant to, though not necessarily dispositive of, a disability determination. Fourth, as will be discussed below, the factfinder did consider physical exertion as an important factor in his analysis, and concluded that Harris was not disabled.

■ We hold therefore that the proper legal standard for comparing employment under the regulation should include a range of factors, with no single factor assuming paramount importance as a matter of law. This multi-factor standard is a sound one. *See Big Horn Coal Co. v. Office of Workers' Comp. Programs*, 897 F.2d 1052, 1056 (10th Cir.1990) (assessing the full range of factors mentioned in *Ratliff* as well as compensation, and not focusing on a single factor); *Pate v. Director, Office of Workers' Comp. Programs*, 834 F.2d 675, 677 (7th Cir.1987) (examining a range of factors and declining to choose one as being of primary importance). As the various cases indicate, the range of

factors may include compensation, skills and abilities required, levels of exertion, status, responsibility, working conditions, and work location. *See Big Horn,* 897 F.2d at 1056; *Pate,* 834 F.2d at 677; *Ratliff,* 816 F.2d at 1125; *Echo,* 744 F.2d at 331. Of course, the weight to be assigned a given factor in a particular case is classically within the province of the fact-finder.

In this case, the ALJ undertook such a broad-based factual inquiry, but accorded no undue weight to any one factor. The ALJ considered the technical skills and knowledge required for each job, the specific tasks each entailed, the levels of physical exertion each required, and even the compensation Harris could earn as a federal mine inspection supervisor. There is no indication that the ALJ presumed that petitioner's other employment around the coal mines precluded petitioner from showing he was totally disabled due to black lung disease. *See* 30 U.S.C. § 902(f)(1)(B); *Ratliff,* 816 F.2d at 1123. Such an analysis of different factors bearing upon the comparability and gainfulness of employment was a proper application of § 727.203(b)(1). By contrast, making physical exertion the sole determinant distorts results reached under the regulation by focusing on a single aspect of employment to the effective exclusion of the employment experience as a whole.

### B.

Harris argues, however, that the evidence at the hearing did not support the ALJ's finding that the two jobs were comparable. According to Harris, a finding of comparability cannot be supported because being a mine inspection supervisor requires more managerial and supervisory skills but less physical exertion, while being a mine electrician involves strenuous physical labor but no paperwork or supervisory duties. Simply put, because one job is primarily an administrative position spent at a desk and the other entails hours down a mine shaft repairing heavy equipment, the work is completely different.

Our role in the determination of this question is not one of first-instance review. Rather, it simply is to determine whether substantial evidence in the record as a whole supports the ALJ's decision. *See* 33 U.S.C. § 921(b)(3) (incorporated into the Black Lung Benefits Act by 30 U.S.C. § 932(a)); 20 C.F.R. § 802.301(a); *see also Wilson v. Benefits Review Bd.,* 748 F.2d 198, 199–200 (4th Cir.1984). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' *Richardson v. Perales,* 402 U.S. 389, 401 [91 S.Ct. 1420, 1427, 28 L.Ed.2d 842] (1971). While this court must review the entire record, we may neither redetermine the facts nor substitute our own judgment for that of the ALJ." *Freeman United Coal Mining Co. v. Benefits Review Bd.,* 919 F.2d 451, 452 (7th Cir.1990).

The dissent does acknowledge the appropriate standard of review. It then proceeds, however, to redetermine the issue from ground zero. Such reweighing of the evidence is an exercise in de novo review, not a substantial evidence inquiry. Factfinders exist for definite purposes, one of which is to observe the demeanor of claimants whose testimony is frequently the only live testimony at the hearing. Appellate courts are well-positioned to determine whether a factual finding is without support in the evidence; we are much less able simply to overturn a factfinder on a question on which two views of the evidence are possible. Regrettably, the dissent has attempted this last feat, and in so doing has read the record before the ALJ to accentuate differences and downplay similarities between Harris' private and government employment. For example, while the dissenting opinion notes that the claimant's "Work Activity Development Worksheet" with its parallel columns for comparing physical activities was submitted into evidence, dissenting op. at 110 n. 3, it omits the fact that Harris himself indicated on the form that both jobs required walking, standing, sitting, stooping, bending, and kneeling. Plainly, this description is something the ALJ could consider in finding comparability. The dissent also challenges the ALJ's factual findings of the government job requiring "a great deal of walking" and "occasional crawling" by focusing on the claimant's oral testimony about when he walked and crawled in the mines, *id.* at 110 n. 3 & 111, but minimiz-

ing Harris' statement on the form that his government job entailed a "lot of walking [and] crawling." Factfinders routinely resolve discrepancies between evidentiary sources, and by being able to observe testimony first-hand, they are in the best position to do so. The dissenting opinion thus serves to illustrate the special hazards of attempting first-instance fact finding in the course of an appeal. In taking one view of the evidence, the dissent ignores the fact that other views are at the very least quite plausible. Indeed, the real import of the dissent's position is that any job with substantial office or supervisory responsibilities cannot be comparable to previous mine employment as a matter of law. We think it risky, however, to resolve individualized disability determinations of this sort in such categorical terms.

■ Rather, we agree with the Director and the other circuits that disability, specifically here rebuttal of an interim presumption of disability, should be determined as a factual matter, and that the deference mandated by the standard of review should apply. In this case, substantial evidence supports the ALJ's finding that the two jobs were comparable. Evidence in the record indicates that the jobs of federal mine inspection supervisor and mine electrician shared significant attributes. Both jobs required a technical knowledge of coal mine machinery, electricity, and their use in the mines. As an electrician, Harris had to use and repair a wide variety of mining equipment; as an inspection supervisor, he had to know about and use even more types of mine safety and rescue equipment. From this evidence, the ALJ certainly could find, as he did, that Harris "was skilled in using various machines at both jobs," and that both jobs "required technical knowledge." This carry over of knowledge about coal mines and mining machinery and equipment indicates comparability. As the Director notes, Harris himself made a con-

scious decision upon leaving private employment to pursue a government job that drew upon the skills and experience obtained during his twenty-one years in the mines.

Harris' work as a federal mine inspection supervisor also required physical effort. Harris testified that he continued to enter the mines a couple of times each quarter, and that the job still required him to crawl through low coal. Being an inspection supervisor also did not relieve Harris of the obligation to carry certain types of equipment with him into the mines. The ALJ's listing of this "heavy and cumbersome equipment" included large self-rescuers, safety lights, and methane detectors. As we have noted, Harris' own description of the physical activities of each job indicated that both required many of the same physical activities, including walking, standing, sitting, stooping, bending, and kneeling, with the government job requiring even more climbing of ladders than the electrician position. This evidence of exertion, along with the evidence of comparable skills and knowledge, supported the ALJ's finding of § 727.203(b)(1) rebuttal.*

It may be readily conceded, as the Director has, that Harris spent less time in the mines, lifted less heavy equipment, and exerted himself less as a mine inspection supervisor than as a mine electrician. To focus purely on exertion level, however, is to accede to the single factor inquiry that we have earlier rejected. The two jobs should be assessed along a variety of different grounds by a fact-finder in the best position to compare the overall circumstances of employment. Obviously, the positions of federal mine inspection supervisor and mine electrician are not an exact match, but they need not be; "the statute requires comparability, not identity." *Pate*, 834 F.2d at 677. Given this standard, there is plainly substantial evidence in the record to support the ALJ's determination.

---

* Testimony in the record gave Harris' salary as a federal mine inspection supervisor as $48,000 in 1986. While the ALJ noted only that Harris could "earn full pay at his current job," salary comparison would have been difficult given the twenty-year time lapse since Harris earned $11,000 as a mine electrician and the lack of any definitive evidence before the ALJ on 1986 wages for mine electricians. Still, the testimony about Harris' salary and benefits in his government job certainly indicated that it was gainful employment under § 727.203(b)(1), and that the ALJ appropriately considered this factor.

### III.

In sum, we uphold the finding that petitioner's employment as a federal coal mine inspection supervisor rebutted the interim presumption of total disability due to pneumoconiosis. For the above reasons, the decision of the Benefits Review Board is

AFFIRMED.

SPROUSE, Senior Circuit Judge, dissenting:

The questions on this appeal are whether the ALJ used the appropriate standard and based his decision on substantial evidence when he denied Harris's black lung benefits. Nothing in the majority's opinion dispels my belief that the ALJ's decision on both grounds was erroneous. Consequently, I respectfully dissent.

### I

To begin with, I disagree with the inclusion of certain factors in the standard the majority adopts for determining whether a claimant's job is "comparable" to his former work as a coal miner under 20 C.F.R. § 727.-203(b)(1). If the reach of the decision were confined to this case, I would not be concerned because I feel there is not substantial evidence even under the majority's formulation of the standard to support the ALJ's decision. But it will relate, of course, to ex-miners in other occupations pursuing benefits.[1]

I agree that work location, work conditions, physical exertion, and compensation (if substantially less) are proper factors to consider in comparing current work to previous coal mine work under this regulation—Congress has indicated as much. In 1978 it amended the Federal Coal Mine Safety and Health Act, 30 U.S.C. § 902(f)(1)(B)(ii), "in response to the administrative practice of denying claims solely on the basis of employ-

ment status without regard to the type of work being performed." H.R.Conf.Rep. No. 864, 95th Cong., 2d Sess. 16–17 (1978), reprinted in 1978 U.S.C.C.A.N. 237, 308, 310. The House of Representatives had urged the passage of the amendment to prevent the denial of benefits on the basis of continued mine employment if

> (1) the location of such employment was recently ... changed to a mine area having a lower concentration of dust particles, (2) the nature of such employment was changed so as to involve less rigorous work, or (3) the nature of such employment was changed so as to result in the receipt of substantially less pay.

H.R.Rep. No. 151, 95th Cong., 2d Sess. 11 (1978), reprinted in 1978 U.S.C.C.A.N. 237, 247. While the later enacted statute did not speak in these terms, some courts have considered them important in the disability inquiry. See e.g., Echo v. Director, OWCP, 744 F.2d 327, 331 (3d Cir.1984); Ratliff v. Benefits Review Bd., 816 F.2d 1121, 1124 (6th Cir.1987). In addition, the statute provides that the claimant's "reduced ability to perform" is a relevant factor even if he still works in the mines. 30 U.S.C. § 902(f)(1)(B)(ii).

But factors such as educational requirements, status, responsibility, and greater compensation may be unhelpful and potentially misleading. For instance, if a claimant leaves coal mining to sell insurance, the fact that the insurance firm requires its salesmen to have college degrees sheds no light on the question whether the claimant is physically disabled. The inquiry is whether "there are changed circumstances of employment indicative of reduced ability to perform [the claimant's] usual coal mine work." 30 U.S.C. § 902(f)(1)(B)(ii). The improvement in the claimant's status from miner to insurance agent is also irrelevant; it does not indicate whether his "ability to perform his usual coal

---

1. The majority opinion in response to my dissent insists that the standard I would adopt relies "crucially" on the amount of physical exertion involved in the jobs under comparison. That does not fairly characterize what I have written. See infra page 109.

  To summarize, I think the proper factors to consider in determining if an ex-miner's work

is comparable to his past coal mine work include work location, work conditions, physical exertion, amount of compensation (if substantially less), skills, and abilities. I think it is inappropriate to consider such factors as educational requirements, status, responsibilities, or higher compensation.

mine work" has decreased or remained the same. Responsibility is an equally unhelpful factor. Harris's responsibility increased when he became an inspection supervisor: he supervised six other people. But the change does not indicate whether he was able to perform work comparable to a mine electrician. *See Ratliff*, 816 F.2d at 1125 (6th Cir.1987). Although decreased status and responsibility in a new job may indicate that the former and current work are not comparable, the converse, as here, is not true. For the same reason, an increase in compensation is irrelevant to the disability inquiry.[2]

Because coal mining is among the most physically demanding of all jobs, in my view, a very persuasive indicator of a disability is the exertional ability required by the new job compared to that required in the claimant's coal mining work. The Sixth Circuit, discussing this proposition, has stated:

> [I]f a person formerly had the ability to shovel heavy coal in a coal mine, and is now shoveling gravel in a dusty gravel pit, then it might be an indication that the person is not really suffering from a physical disability. If, however, the former coal shoveler is now the personnel manager for a gravel pit, there is no indication of the person's ability even to rise from a wheelchair.
>
> ... Supervising employees and occasionally hitting buttons is not similar to crouching in a dusty mine shaft and shoveling coal. The fact that [the claimant] can

work as a foreman does not indicate that he is physically sound.

*Ratliff*, 816 F.2d at 1125.

To summarize, I think the proper factors to consider in determining if an ex-miner's work is comparable to his past coal mine work include work location, work conditions, physical exertion, amount of compensation (if substantially less), skills, and abilities. I think it is inappropriate to consider such factors as educational requirements, status, responsibilities, or higher compensation. I understand the majority's effort to afford ALJs the opportunity to consider the broadest spectrum of evidence that may be probative of the ultimate issue in this discrete area of administrative law. In my view, however, Congress intended rebuttal evidence under 20 C.F.R. § 727.203(b)(1) to be narrowly circumscribed.

II

In any event, I think the ALJ's decision should be reversed even under the majority's broad standard for determining employment comparability because there was not substantial evidence to support the ALJ's findings. It is, of course, important to remember that we are not fact finders. *Freeman United Coal Mining Co. v. Benefits Review Bd.*, 919 F.2d 451, 452 (7th Cir.1990). As the majority correctly notes, our task on review is to determine if there is substantial evidence to support the ALJ's findings—that is, "such

---

2. Here, the evidence relating to compensation is inconclusive:

Q: Could you tell me what your annual income is now?
A: $48,000
Q: What about Chief Electricians?
A: Section Foremen ... down in our area is making $55,000 or $60,000. I would say that a Chief Electrician would make $60,000 or $65,000. Now that is just an opinion, I don't know.

Even if Harris were receiving higher compensation, however, that factor should not be considered. Courts have considered compensation as a helpful factor if the claimant receives substantially less pay, *Big Horn Coal Co. v. OWCP*, 897 F.2d 1052, 1056 (10th Cir.1990), in his new job because one can infer that the claimant would perform the work required of his previous, higher-paying position if he were able. But if the claimant's salary has *increased*, we learn nothing

about his ability to work as a miner—we learn only that he has improved his lot in life. *Id.*

I view the Third Circuit's decision in *Echo v. Director, OWCP*, 744 F.2d 327 (3d Cir.1984), as supportive of this position. In considering an ex-miner's appeal from a denial of benefits, it reversed because the ALJ had not considered Echo's diminished earnings at his post-mining employment. *Id.* at 332. The opinion throughout embraced the concept that it was the diminution of compensation, among other things, that was significant. The court remarked:

> We reiterate what Congress has said: the fact that an applicant is employed does not in and of itself rebut the presumption. Moreover, the fact that an applicant's current earnings are *less* than those of his fellow workers in the mines provides strong evidence that his present work is not "comparable."

*Id.* at 331 (emphasis added).

relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quotation omitted). Nevertheless,

> an appellate court may not reweigh the evidence or substitute its judgment for the [ALJ's], we may not simply rubberstamp [his] decision without a critical review of the evidence.

*Howell v. Sullivan*, 950 F.2d 343, 347 (7th Cir.1991) (quotation omitted). And in conducting our review, we must

> review the record as a whole and consider adverse as well as supporting evidence. We may not affirm simply by isolating a specific quantum of supporting evidence.[3]

*Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir.1989) (quotation omitted); *see also Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir.1985).

3. Although it may be somewhat tedious, in my view the only way to resolve a viable issue of substantial evidence is to compare the ALJ's findings of fact with the record evidence on which he grounded his findings. Fortunately, the record we review is not long. The ALJ's findings on the comparability issue were based solely on two items of evidence: a form submitted by Harris in the application process (Director's Exhibit 5) and Harris's testimony. The form includes parallel columns for yes/no questions designed to solicit information comparing the applicant's previous mining activities with the activities required by his current employment. The relevant findings and evidence follow.

*ALJ's Finding*

Physically, the Claimant was required to walk, stand, sit, stoop, bend, and kneel at both jobs. As an electrician, the claimant did strenuous work requiring additional lifting and carrying. As an inspector, the Claimant is required to do a great deal of walking, along with occasional crawling and ladder climbing.

**Evidence**

In the Director's Exhibit 5 in remarks concerning physical activities, Harris noted as to mine work, "Strenuous work. [L]ot of lifting [and] carrying. Worked from all positions." As to mine inspecting, he noted, "Lot of walking [and] crawling. Very little lifting. Occasionally climb[ ] ladders." In his testimony, he explained:

> Q. Do you still have to go into low coal for any reason?
> A. Yes, sir.
> Q. How often would that be?
> A. Well, not too often; like I told you, I go in [the mines] a couple of times a quarter and if it is low I go and if it is high, I go; and thankfully the last little while, most of it has been pretty high.
> Q. When you do have to go into low coal, do you usually have to crawl?
> A. Some of it you crawl, you get, you are talking about 30 inch, something like that; you crawl; normally like I say, they will haul us in a mine car, something to the section and we get out and crawl; but if you go into like 42, 48–inch coal, I guess you crawl some and you hump some; you do the best you can.

*ALJ's Finding*

On inspection, the Claimant would either walk or crawl through the mine, carrying with him such heavy and cumbersome equipment as a large self-rescuer, safety light, methane detector, and other equipment attached to his belt.

**Evidence**

> Q. Do you carry any gear of any kind?
> A. Well, you have got your, the big self-rescuer; normally, you will ride something to the section; we will leave the big rescue with the section rescues and you have got your little rescue, your safety light, and your methane detector and stuff like that.
> Q. Do you ever carry any specialized equipment of any sort or do you have somebody else do that?
> A. No, sir, I don't carry any, just my flame light and my methane detector and anemometer stuff which I hook on my belt.

*ALJ's Findings*

Finally, although the physical exertion required of both jobs is not exactly the same, it is close enough to constitute comparable equipment [sic]. A great deal of physical activity is required for both jobs.

**Evidence**

On Director's Exhibit 5, Harris noted that he used "Mechanic tools [and] skills" in his mine work and "Safety equipment and devices, rescue equipment" in his inspection work. Although the exhibit shows that he did "a lot of walking [and] crawling," he did "[v]ery little lifting" and only "occasionally climb[ed] ladders." He testified:

> An underground electrician ... does ... electrical, hydraulical, [and] mechanical [repairs]; in other words, whatever happens to a piece of mine equipment, you have to fix it and a lot of times it meant taking "come alongs" and ... slate bars and moving motors that weighed 1800 pounds and carrying heavy stuff underground in a cramped position; and of course, when I came with the government, not only was this a 40–hour–a–week job, and you don't do any [repair] work, that is one of the rules.

When asked to compare the two jobs, Harris testified that "there is no comparison physically with what you do as an inspector as you do when you are working in the mine." Finally, when asked if he could return to a full-time job of underground mining, he replied, "No, sir." He explained: "Well, you know, if I go underground, you know, where there is low coal, I have got trouble breathing; if I go underground in low coal, I have trouble breathing. [I] can't exert [myself]."

The evidence here shows that Harris spent at least twenty-one years of his working time underground and experienced high-dust exposure as a mine electrician. He worked at least forty-hour weeks and, on occasion, was required to be in the mine as long as twenty-four hours at a time. He frequently lifted and carried equipment, and his physical activities included bending, stooping, crawling, kneeling, and walking. On occasion, with the help of machines, he moved motors weighing up to 1800 pounds. He also made electrical, hydraulic, and mechanical repairs under time and logistic pressures. Harris's straightforward coal miner's narrative described some of the salient details of his coal mine experience:

> After [a job picking slate] I went to what is called an electrician helper and part of this work was in a motor barn that they had underground; everything in the mine, it was gassy; everything in the mine was battery; and you worked some in the barn; and you worked some out on the section; and the worst thing that I had to do in that job, I believe, for dust is that we changed these battery motors that had a light stall built in them and you take two motors that went together and you run one in and put the battery on the rack and then you took the other motor out and put it under a fresh battery and of course, the motor is running over this track day in and day out, and it bumped a lot of sand out, and the rails were covered with sand; and the track was used so much that it was generally bad and so when you went in these stalls, a lot of time you would have to get a run and when you got to the frog, you would reverse the motor and spin the wheel and it would boil that daggone sand dust up in the air and it just stood there and so, that was the bad part about that and then I went from that to a trouble shooter, electrician trouble shooter; and of course you would spend a lot of time right in the face area as trouble shooter; and sort of the bad part about that is, that if you have a breakdown; say, you have got a shuttle car that breaks down, they are going to get it out of their way so that they can keep running coal, and so if a return is where they get it out of the way, that is

where you work on it; and so you are exposed to a lot of dust.

> I have, honestly, on the sections that I have been on, I had to feel for the timbers to see how to walk back on section, that dust was that bad.

Harris's job as a mine inspection supervisor was quite different. He worked primarily in an office, planning health and safety programs, making assignments to inspectors, and running health and safety tests. The ALJ principally rests his conclusion of work comparability on his finding that Harris on occasion was required to enter the mines, and when he did so he walked, crawled, carried heavy equipment, and occasionally climbed ladders. To begin with, this finding, as it relates to crawling and carrying heavy equipment, follows from a selective reading of the record. The testimony shows:

> Q. Do you carry gear of any kind?

> A. Well, you have got your, the big self-rescuer; normally, you will ride something to the section; we will leave the big rescue with the section rescues and you have got your little rescue, your safety light, and your methane detector and stuff like that.

> Q. Do you ever carry any specialized equipment of any sort or do you have somebody else to do that?

> A. No, sir, I don't carry any, just my flame light and my methane detector and anomometer stuff which I hook on my belt.

Harris's primary function was to ensure that the mine inspectors performed their jobs. On the few occasions when he was inside the mine, he performed no mine work. Indeed, he testified that as an inspection supervisor he was forbidden by federal regulations to do so. Although during these brief periods when he encountered "low" coal he was required to crawl, he did no lifting and carried only light equipment: a small rescuer, a safety light, a methane detector, and "anomometer [sic] stuff which I hook on my belt." Quite clearly, this level of physical exertion does not come close to lifting heavy equipment while in a cramped position or moving heavy motors. More important, however, is Harris's uncontroverted testimony that as a supervisor he entered the mines only two to

three times a quarter. In other words, he spent a maximum of from *eight to twelve days a year* walking in the mines and carrying light equipment. Assuming a work year of fifty weeks, his annual work days total 250. Two hundred thirty-eight days of sitting at a desk doing paperwork in a dust-free office plus eight to twelve days in the mines doing minimal physical activity simply does not equate to a mine electrician's work of 250 days of heavy lifting, carrying, crawling, stooping, and "humping" in the dark and dusty underground.

Other evidence bears on equally critical factors. Harris testified that much of his work as an electrician was performed in areas where the air was saturated with sand and coal dust. His work as a supervisor does not include even remotely similar conditions. As a mine electrician he was required to work underground in the dust; as an inspection supervisor he spent all but eight to twelve days a year in a dust-free office above ground. Further, as a mine electrician, he was required to work in low coal where the dust concentration is most severe; whereas he testified that as an inspection supervisor, on the infrequent occasions when he entered the mines, he walked mostly through high coal and entered low coal "not too often." As a mine electrician in times of emergency he worked up to twenty-four hours at a stretch, but as an inspector he worked regular hours only. As an inspection supervisor he obviously used some of his previously acquired expertise, but he also used technical knowledge learned in training courses pursued after he left his job as an electrician.[4] Finally, as a mine inspector, he used managerial, organizational, and supervisory skills.

The sum of these differences relates not only to physical exertion but also to skills, abilities, work location, and work conditions. In my view, the ALJ's decision does not comport with the substantial evidence standard and violates the intent of the Black Lung Benefits Act. The purpose of that Act is to compensate *as far as possible* a diseased miner for the condition inflicted on him by the mining process:

> The original legislation was intended to remedy a number of safety problems endemic to coal mining, then considered "the most hazardous occupation in the United States," H.R.Rep. No. 563, 91st Cong., 1st Sess. 1 (1969), *reprinted in* 1969 U.S.C.C.A.N. 2503, 2503.... Congress sought to minimize the risk of all-too-frequent mining accidents. There was a further work hazard, however, for which inspections could offer little protection: pneumoconiosis, commonly known as black lung disease. Accordingly, Congress sought to provide *what relief it could* in the form of disability payments to those miners who were "totally disabled" as a result of black lung disease.

*Echo,* 744 F.2d at 329 (citing 30 U.S.C. § 901) (emphasis added). In other words, the inquiry of whether a still-employed claimant is totally disabled should be guided by a pragmatic test measuring whether his health has been sacrificed sufficiently to require monetary compensation. The Supreme Court, upholding the Black Lung legislation, noted that "destruction of earning capacity is not the sole legitimate basis for compulsory compensation of employees by their employers. We cannot say that it would be irrational for Congress to conclude that impairment of health alone warrants compensation." *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 23, 96 S.Ct. 2882, 2896, 49 L.Ed.2d 752 (1976) (citation omitted). It follows that a claimant's performance of work different from that required in his previous mining job could merely demonstrate that he retains the ability to work in some other capacity, in spite of his decreased breathing capacity or physical ability. Again, in my view, there was not substantial evidence to demonstrate that Harris's job as a mine inspection supervisor was indicative of his ability to perform the kind of work he had performed as a mine electrician. Considered as a whole, the evidence is not "such relevant evidence as a reasonable mind might accept as adequate to

---

4. Q. When you worked for MSHA [the federal agency employing him], did you receive any advance training beyond what you learned in high school?

A. After I came to work for them?
Q. Yes?
A. Continuous training.

support" the conclusion of comparability reached by the ALJ. *Perales,* 402 U.S. at 401, 91 S.Ct. at 1427 (quotation omitted).[5]

---

**5.** The majority characterizes my substantial evidence analysis as "fact finding." The choice of the relevant facts I have set out appears unchallenged. Likewise unchallenged is the recitation of the ALJ's findings based on those facts. I have pointed out where the facts do not substantially support the finding. This is substantiality review. I respectfully suggest that my learned brother covers his own serious misreading of the record under broadly and thickly brushed rhetoric.